44 F.3d 437
 63 USLW 2425, 2 Wage & Hour Cas.2d (BNA) 814
 The ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY,
Burlington Northern Railroad Company, Consolidated Rail
Corporation, CSX Transportation, Inc., Illinois Central
Railroad Company, Norfolk Southern Railway Company, Norfolk
& Western Railway Company, Southern Pacific Transportation
Company, and Union Pacific Railroad Company, Petitioners,
v.
Federico PENA, Secretary of Transportation, et al., Respondents,
and
Brotherhood of Locomotive Engineers, and United
Transportation Union, Intervening Respondents.
 Nos. 93-1505, 93-2378, and 93-2712.
 United States Court of Appeals,
Seventh Circuit.
 Argued Feb. 22, 1994.
Decided July 13, 1994.
Argued En Banc Oct. 18, 1994.
Decided Dec. 29, 1994.
 
 Thomas J. Knapp, Lawrence M. Stroik, W. Douglas Werner, Fort Worth, TX, Ronald M. Johnson (argued), Mark V. Holden, Akin, Gump, Strauss, Hauer & Feld, Washington, DC, Guy Vitello, Atchison, Topeka & Santa Fe Ry. Co., Schaumburg, IL, for Atchison, Topeka and Santa Fe Ry. Co.
 Thomas J. Knapp, Lawrence M. Stroik, W. Douglas Werner, Fort Worth, TX, Ronald M. Johnson, Mark V. Holden, Akin, Gump, Strauss, Hauer & Feld, Washington, DC, for Burlington Northern R. Co., Southern Pacific Transp. Co.
 Thomas J. Knapp, Lawrence M. Stroik, W. Douglas Werner, Ronald M. Johnson, Mark V. Holden, Akin, Gump, Strauss, Hauer & Feld, Washington, DC, John B. Rossi, Jr., Andrew P. Cocoran, Consolidated Rail Corp., Philadelphia, PA, for Consolidated Rail Corp.
 Thomas J. Knapp, Lawrence M. Stroik, W. Douglas Werner, Ronald M. Johnson, Mark V. Holden, Akin, Gump, Strauss, Hauer & Feld, Washington, DC, James D. Tomola, CSX Transp., Inc., Jacksonville, FL, for CSX Transp., Inc.
 Thomas J. Knapp, Lawrence M. Stroik, W. Douglas Werner, Ronald M. Johnson, Mark V. Holden, Akin, Gump, Strauss, Hauer & Feld, Washington, DC, Ronald A. Lane, Illinois Cent. R. Co., Chicago, IL, for Illinois Cent. R. Co.
 Thomas J. Knapp, Lawrence M. Stroik, W. Douglas Werner, Ronald M. Johnson, Mark V. Holden, Akin, Gump, Strauss, Hauer & Feld, Washington, DC, William P. Stallsmith, Jr., Norfolk Southern Corp., Norfolk, VA, for Norfolk Southern Ry. Co., Norfolk & Western Ry. Co.
 Thomas J. Knapp, Lawrence M. Stroik, W. Douglas Werner, Ronald M. Johnson, Mark V. Holden, Akin, Gump, Strauss, Hauer & Feld, Washington, DC, Brenda J. Council, Union Pacific R. Co., Omaha, NE, for Union Pacific R. Co.
 John F. Daly (argued), Malcolm L. Stewart, Dept. of Justice, Civil Div., Appellate Section, Rosalind A. Knapp, Dept. of Transp., Washington, DC, for Federico Pena.
 John F. Daly, Malcolm L. Stewart, Dept. of Justice, Washington, DC, for S. Mark Lindsey.
 S. Mark Lindsey, pro se.
 John F. Daly, Malcolm L. Stewart, S. Mark Lindsey, David Herbert Kasminoff, Daniel C. Smith, Billie Ann Stultz, Federal R. Admin. Office of the Chief Counsel, Washington, DC, for Federal R. Admin.
 John F. Daly, Malcolm L. Stewart, Rosalind A. Knapp, Dept. of Transp., Washington, DC, for National Transp. Safety Bd.
 Lawrence M. Mann, Alper & Mann, Washington, DC, for Brotherhood of Locomotive Engineers, United Transp. Union.
 Janet Reno, U.S. Atty. Gen., Washington, DC, John F. Daly (argued), Malcolm L. Stewart, Dept. of Justice, Civil Div., Appellate Section, Rosalind A. Knapp, Department of Transp., David Herbert Kasminoff, Daniel C. Smith, Billie Ann Stultz, Federal R.R. Admin., Office of the Chief Counsel, Lawrence M. Mann, Steven M. Weisbaum, Alper & Mann, Washington, DC, for National Transp. Safety Bd.
 Before POSNER, Chief Judge, BAUER, COFFEY, FLAUM, EASTERBROOK, RIPPLE, MANION, KANNE, and ROVNER, Circuit Judges.*
 BAUER, Circuit Judge.
 
 
 1
 Petitioners, nine of the nation's largest railroads accounting for ninety percent of the industry's train operations, petition for review of the Federal Railroad Administration's (FRA) re-interpretation of the Hours of Service Act of 1907, 45 U.S.C. Secs. 61-66. The railroads challenge the FRA's recent announcement that it was abandoning an established interpretation of the Act and would consider as time on duty that time spent waiting for transportation to a designated terminal by a train crew that has been relieved of all operating duties of the train to which it is assigned. We find that the FRA's decision is entitled to no deference, and we interpret the Act, and eighty-five years of industry practice, such that this waiting time does not constitute time on duty.
 
 
 2
 Some background is necessary to place this issue in proper context. The Hours of Service Act imposes a limit on the maximum hours of service that a train crew can continuously operate trains while on duty. From the date of its original enactment through the late 1960's, the Interstate Commerce Commission administered and enforced the Act. Then, the Federal Railroad Administration, a component of the Department of Transportation, was created to take over these duties from the ICC.
 
 
 3
 "The purpose of the statute is to promote safety in operating trains by preventing the excessive mental and physical strain which usually results from remaining too long at an exacting task." Chicago & A.R. Co. v. United States, 247 U.S. 197, 199, 38 S.Ct. 442, 443, 62 L.Ed. 1066 (1918). In its original form, the Act limited train crews to sixteen continuous hours operating trains. c. 2939, Sec. 2, 34 Stat. 1416 (codified as amended 45 U.S.C. Sec. 62(a)(1)). Congress amended the Act so that since 1971, the maximum shift consists of twelve hours. 45 U.S.C. Sec. 62(a)(1). The Act also imposes mandatory time off duty before an employee can resume his operating duties. An employee who has worked a continuous twelve-hour shift must receive ten consecutive hours off duty. Id. In addition, no employee can be called to operations duty unless he has received eight continuous hours of off-duty time in the preceding twenty-four hour interval. 45 U.S.C. Sec. 62(a)(2).
 
 
 4
 Because of the itinerant nature of railroad operations, the limitation on a train crew's hours of service presents special problems to railroads. Obviously, when a train crew reaches its twelve-hour maximum it must cease operating its assigned train. If the train has not yet reached its destination, the "expired" or "outlawed" crew must "park" the train and wait for transportation to its designated terminal. The transportation typically is in the form of a railroad-owned van or another train going to the crew's designated terminal. The designated terminal may be the crew's home terminal or the "away from home" terminal designated by the railroad. See 45 U.S.C. Sec. 61(b)(4). The railroad must then transport another crew to the parked train to operate the train until it reaches its destination. Transportation to or from a parked train is called "deadhead" transportation.
 
 
 5
 In its 1969 amendments to the Act, Congress addressed the categorization of the time spent by crews in deadhead transportation. Section 61(b)(3)(C) includes as time on duty that "[t]ime spent in deadhead transportation by an employee to a duty assignment: Provided, [t]hat time spent in deadhead transportation by an employee from duty to his point of final release shall not be counted in computing time off duty...." The time spent in deadhead transportation from the parked train to the crew's designated terminal became known as "limbo time:" time which does not count against the twelve-hour limitation upon on-duty time nor contributes to the off-duty time that necessarily must accrue before an employee may return to duty. Unfortunately, the Act does not specifically address how time spent by an outlawed crew waiting for deadhead transportation must be categorized. Since the enactment of the 1969 amendments to the Act, the FRA has treated this waiting time as though it was time spent in deadhead transportation to the crew's designated terminal; the waiting time, thus, has been treated as limbo time. In addition, it appears that the Act, at least in the practical terms of the way it had been enforced since 1907, had never been construed to require that this waiting time be considered time on duty.
 
 
 6
 Things changed in 1992. In that year, the Ninth Circuit Court of Appeals rejected the FRA's interpretation of the Act in United Trans. Union v. Skinner, 975 F.2d 1421 (9th Cir.1992). Oddly, the Ninth Circuit held that the time spent waiting for deadhead transportation to a crew's designated terminal is time on duty, "based on the language of the HSA and on its consistent interpretation by the courts throughout its 85-year history." Id. at 1422. In an unusual move in that case, while it vigorously defended its own interpretation of the Act, the FRA declared itself willing to adopt and enforce the Ninth Circuit's interpretation of the Act, whatever its decision.
 
 
 7
 As a result of the Ninth Circuit's decision, the FRA notified, by way of a letter dated October 28, 1992, from its Chief Counsel, the Association of American Railroads that while the FRA has traditionally regarded the waiting time as limbo time, it no longer would. The letter stated that the FRA did not agree with the Ninth Circuit's rationale, but would adopt it and enforce it nationwide. The FRA implemented its new enforcement scheme on November 1, 1992, in those states that comprise the Ninth Circuit, and on January 1, 1993, in the rest of the country. Within sixty days of the nationwide effective date, the railroads filed in this court a petition for review pursuant to 45 U.S.C. Sec. 431(f) and 28 U.S.C. Sec. 2342(7). In addition, the railroads filed with the FRA a Petition for Interpretation of the Hours of Service Act on March 26, 1993.[1] On April 8, 1993, the FRA published its new interpretation of the Act in the Federal Register, much of which was taken verbatim from the FRA's letter to the railroads. From this agency action, the railroads filed another petition for review on June 7, 1993. Finally, in response to the FRA's July 1, 1993, denial of the railroads' Petition for Interpretation, the railroads filed yet another petition for review from this agency action. All told, the railroads filed three petitions for review.
 
 
 8
 This description of this flurry of activity between the FRA and the railroads leads us to inquire whether we have jurisdiction to settle this dispute. Section 2342(7) of Title 28 confers exclusive jurisdiction upon the appropriate court of appeals to enjoin, set aside, suspend, or to determine the validity of all final agency actions with respect to federal railway safety laws. All that is required to invoke this jurisdiction is the filing of a petition in accordance with 28 U.S.C. Sec. 2344, which the railroads have done. Because the FRA's action is clearly within the ambit of the federal railway safety laws, the only possible issue with respect to our jurisdiction is whether the FRA's conduct constitutes a final agency action within the meaning of the statute.
 
 
 9
 Congress amended Sec. 2342 in 1992 to include subsection 7. Because of the recent vintage of this amendment, there is a lack of authority as to what constitutes a "final agency action" pursuant to 28 U.S.C. Sec. 2342(7). Because it appears that "final agency action" in this context carries the same meaning as it does in the Administrative Procedures Act, Sec. 10(c), 5 U.S.C. Sec. 704, we will apply the same standards applicable to the APA.
 
 
 10
 Several factors are significant in determining the finality of agency action, including: 1) whether the challenged action is a definitive statement of the agency's position; 2) whether the actions have the status of laws with penalties for noncompliance; 3) whether the impact on the aggrieved party is direct and immediate; and 4) whether immediate compliance was expected. Abbott Laboratories v. Gardner, 387 U.S. 136, 150-52, 87 S.Ct. 1507, 1516-17, 18 L.Ed.2d 681 (1967). After reciting these factors, the Supreme Court recently stated that "[t]he core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." Franklin v. Massachusetts, --- U.S. ----, ----, 112 S.Ct. 2767, 2773, 120 L.Ed.2d 636 (1992).
 
 
 11
 In this case, there is no question that the FRA made absolutely clear that it would enforce the Act in accordance with its new interpretation, thereby compelling the railroads to alter their operations to comply with the FRA's directive or face stiff penalties for noncompliance. To answer the "core question," the agency completed its decisionmaking process (or at least the Ninth Circuit completed the FRA's decisionmaking for it) and the result directly affected the railroads. The FRA's communication of its change in interpretation of the Hours of Service Act constitutes a final agency action within the context of 28 U.S.C. Sec. 2342(7), and therefore, we have jurisdiction to hear this case and we grant the railroads' petitions for review.[2]
 
 
 12
 The first issue here is what deference, if any, we are to allow the FRA's new interpretation of the Act. The FRA argues that its interpretation of the Act is entitled to substantial deference pursuant to Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Under Chevron, the interpretation of an ambiguous statute by an agency that is authorized by Congress to promulgate rules under the statute is to be upheld if it is a reasonable one. While the Hours of Service Act is not unambiguous, the FRA's interpretation is not entitled to the generous treatment afforded agency interpretations under Chevron.
 
 
 13
 Both the railroads and the FRA agree on an important point: that the FRA has not been granted rule-making authority by Congress. The Supreme Court made clear in Chevron, 467 U.S. at 843-44, 104 S.Ct. at 2781-83, that only statutory interpretations by agencies with rule-making powers deserve substantial deference. The principal rationale underlying this deference is that in this context the agency acts as a congressional proxy; Congress develops the statutory framework and directs the agency to flesh out the operational details. But Congress typically does not permit the agency to run free in this endeavor; the Administrative Procedures Act establishes certain procedures that the agency must follow. Chief among them is the notice-and-comment provision of the APA. 5 U.S.C. Sec. 553. This rule-making process bears some resemblance to the legislative process and serves to temper the resultant rules such that they are likely to withstand vigorous scrutiny. It is this process that entitles the administrative rules to judicial deference.
 
 
 14
 In instances in which the agency does not have rule-making authority, however, we consider the agency's application of statutory provisions "interpretive rules." 5 U.S.C. Sec. 553(d)(2); see Doe v. Reivitz, 830 F.2d 1441, 1447 (7th Cir.1987). These interpretive rules are treated differently by the APA. They are exempt from the notice-and-comment requirements of rule-making. 5 U.S.C. Sec. 553(d)(2). In addition, interested parties do not have the right to petition the agency for review of its interpretive rulings as they do with respect to agency rules. See 5 U.S.C. Sec. 553(e).
 
 
 15
 The difference between the two types of agency action is manifest in this case. The FRA arbitrarily decided to abandon twenty-three years (at least) of statutory interpretation and adopted the Ninth Circuit's interpretation, even though it acknowledged that that court's rationale was flawed. The FRA's adoption of that position was not subject to the sort of process that ensures the legitimacy of the legislative or administrative rule-making process. Moreover, the railroads were not permitted to petition the FRA for review of its new interpretation; when they did, the FRA (properly) informed them that it was not required to respond. As a result, considering that the FRA made it clear that it was going to enforce this new interpretation, the railroad's only course of action was to seek judicial review under Title 28.
 
 
 16
 This is not to say that interpretive rules, while undeserving of substantial deference under Chevron, do not warrant any deference from a reviewing court. It simply means that we do not "rubber stamp" these interpretive rules. Pennington v. Didrickson, 22 F.3d 1376, 1383 (7th Cir.1994). Whatever degree of deference due these interpretive rules is dictated by the circumstances surrounding the agency's adoption of its statutory interpretation. "The weight given to an agency interpretation depends on many factors, including the validity of its reasoning, its consistency with earlier and later agency pronouncements and whether the administrative document was issued contemporaneously with the passage of the statute being interpreted." Doe v. Reivitz, 830 F.2d at 1447. In short, we look to "the thoroughness, validity, and consistency of the agency's reasoning." Orrego v. 833 West Buena Joint Venture, 943 F.2d 730, 736 (7th Cir.1991) (citing United States v. Markgraf, 736 F.2d 1179, 1184 (7th Cir.1984)).
 
 
 17
 The FRA's current interpretation of the Act reflects none of the benchmarks indicative of a "deliberate attempt of the agency to implement the will of Congress through the regulatory process." Pennington, 22 F.3d at 1383. By its own admissions, the characteristics of the FRA's current interpretation are completely opposite to those for which we seek. The current interpretation is inconsistent with twenty-three years of agency enforcement; notwithstanding its present plaintive cries that it has always considered this a close question, the FRA has always enforced the Act in a manner opposite that of its current position. In addition, this is an interpretation not contemporaneously made with the legislation or its relevant amendments, but twenty-three years later.
 
 
 18
 Finally, the FRA's current interpretation is not a thorough and reasoned interpretation. It was adopted for no other reason than because the Ninth Circuit disagreed with its prior interpretation. In its letter to the railroads and in its notice in the Federal Register, the FRA candidly admitted that it did not agree with the Ninth Circuit's reasoning. It cannot now rely on post hoc rationalizations regarding safety to justify its abrupt decision to alter its interpretation. This interpretation by the FRA, lacking the characteristics for which we look to determine the reasonableness of agency action, deserves no deference from this court.
 
 
 19
 A final point with respect to deference: Any deference that we might confer upon an agency interpretation of a statute must be to the agency's diligent study of the statute and the underlying activity it seeks to regulate. Here, however, the FRA is essentially asking that we defer to the Ninth Circuit's interpretation of the Act. It was the Ninth Circuit to which the FRA delegated its authority to interpret the Act when it declared that it was willing to accept whatever determination the Ninth Circuit made. And while we carefully consider the opinions of our sister circuits, we certainly do not defer to them. Colby v. J.C. Penney Co., Inc., 811 F.2d 1119, 1123 (7th Cir.1987). Our duty is to independently decide our own cases, which sometimes results in disagreements with decisions of the other circuits.[3] The FRA's abdication of its authority in this matter serves to deny the FRA the substantial deference it seeks.
 
 
 20
 Having dispensed with the issue of deference, we move on then to decide whether time spent waiting for deadhead transportation is time spent on duty. Despite the vigor with which this issue has been litigated both here and in the Ninth Circuit, we believe the statute itself resolves this issue quite clearly. Mindful that the purpose of the Act and its amendments is safety in operating trains, we hold that time spent waiting for deadhead transportation is not time on duty, but limbo time.
 
 
 21
 The statute does not address this issue in so many words, but it clearly dictates our holding. Section 61(b)(2) states that the Act applies only to employees "actually engaged in or connected with the movement of any train...." In addition, according to section 61(b)(3) of the statute, time on duty commences when a crew reports for duty and terminates when the crew is finally released from duty. Further, section 61(b)(3)(D) specifically states that time on duty is comprised of "time an employee is actually engaged in or connected with the movement of any train." The statute's treatment of on-duty time makes sense and comports with the purpose of the statute; the hazards of train operation occur when the train is moving.
 
 
 22
 During the time an outlawed crew waits for its deadhead transportation, however, it has no further operational duties.[4] Obviously, this time spent waiting by the outlawed crew is not time the crew operates a moving train. Unfortunately, the resolution of this issue is not so simple. Remember, time spent in deadhead transportation to the parked train is considered on-duty time. Our evaluation of the time spent waiting for deadhead transportation from the train, then, is directed by the statute's emphasis on the operation of a moving train and the statutory scheme regarding this type of non-operational time.
 
 
 23
 After a crew completes its shift, each employee is required to receive a specified time during which he is able to rest before he is able to operate a train again. Thus, any time spent by an employee that denies him adequate opportunity for rest or that detracts from the rest that he has received must be treated in a way that enhances safety in operating a moving train. Simply put, in characterizing time spent by an employee not directly connected to the operation of a moving train, the critical consideration is how that time will affect the employee who must operate a moving train. Two specific aspects of the 1969 amendments to the Act highlight these principles.
 
 
 24
 As mentioned previously, section 61(b)(3)(C) states that time spent in deadhead transportation by an employee to a duty assignment is time on duty. This is time the employee cannot spend resting and which may ultimately impact his performance during the latter hours of his shift. This section also states that time spent in deadhead transportation from the train to the point of final release is not off-duty time. Nor is it time on duty; hence the tag limbo time. This time is treated in this way for two reasons. First and foremost, it is not on-duty time because the employee has no more operational responsibilities and this time, therefore, does not implicate railroad safety. Second, it is not off-duty time because the employee receives no legitimate opportunity to rest.
 
 
 25
 This analysis of section 61(b)(3)(C) compels our finding that time spent waiting for deadhead transportation is limbo time. In this scenario, the crew has been relieved of all operating duties. It may await transportation on the train or leave the train to await transportation elsewhere. The crew just might retire to a nearby saloon to pass the time. Wherever the outlawed crew waits, it is precluded from operating the train, technically by the statute and practically by the railroad, until the crew receives the requisite off-duty time. The crew's time spent waiting has absolutely no impact on its ability to operate trains. In this way, the waiting is analogous to time spent in deadhead transportation from a duty assignment and is not analogous to time spent in deadhead transportation to a duty assignment. Further, the strong analogy between the waiting time and the time actually spent in deadhead transportation dictates that the waiting time be treated as limbo time.
 
 
 26
 Having determined that the statute resolves the issue, the dispute as to how this time was treated prior to the amendments is unimportant. We digress, however, to briefly explain our understanding of its pre-1969 treatment because the Ninth Circuit framed its decision in that way. The Ninth Circuit set forth the issue as to whether Congress had intended to change the characterization of waiting time as the Act had been applied before the amendments. Skinner, 975 F.2d at 1426. It determined that waiting time had been considered on-duty time and based its holding on a slew of cases from the early part of this century. Id. We, however, read those cases as addressing the categorization of time spent by a railroad crew waiting for repairs to be made or for some other delay before resuming its duties of operating the train; these cases held that the crews were on duty during the time they spent waiting. The holdings in those cases are consistent with our reasoning here: that time spent waiting must be evaluated for its impact on the crew's ability to operate its train.
 
 
 27
 In addition, there was a substantial amount of testimony at Congressional hearings, offered by both union and railroad representatives, that this waiting time was never treated as on-duty time. So, it appears that time spent waiting for deadhead transportation from a train was treated the same before the amendments as immediately after. Our determination simply underscores the point that the FRA's change in interpretation of the statute reversed a long-held practice of deploying crews and imposed a significant hardship on the railroads without contributing to railroad safety.
 
 
 28
 The FRA contends that there are safety issues associated with categorizing waiting time as limbo time. If that is so, the appropriate vehicle for changing the Act is further legislation. Congress has spoken its mind on this matter, and if it changes its mind, it can amend the Act. But the FRA may not effectively amend the statute by way of an interpretive rule to comport with its views on how this waiting time impacts safety issues, whether they be real, illusory, or just plain convenient.
 
 
 29
 Finally, the FRA contends that by invalidating its interpretation, we will create an enforcement nightmare resulting from this split between circuits. That may be true, but there is nothing we can do about it. We can only remind the FRA that it is entrusted with the enforcement of the Hours of Service Act and any decision it makes to refrain from prosecuting violations of the Act is left to its absolute discretion. See, e.g., Heckler v. Chaney, 470 U.S. 821, 831, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985) (collecting cases).
 
 
 30
 In conclusion, we find that the FRA's communications of its interpretation of the Hours of Service Act constitute a final agency action pursuant to 28 U.S.C. Sec. 2342(7), but conclude that it is not entitled to any deference from this court. Further, we hold that, according to the Act, time spent waiting for transportation to a designated terminal by a train crew that has been relieved of all operating duties of the train to which it is assigned is not time on duty, but limbo time. Accordingly, we GRANT the railroads' Petitions for Review and VACATE the FRA's orders.
 
 
 31
 EASTERBROOK, Circuit Judge, with whom POSNER, Chief Judge, and MANION, Circuit Judge, join, concurring.
 
 
 32
 When judges speak of "deference" to an administrative decision or interpretation, they may mean any of three situations:
 
 
 33
 . Delegation. When Congress has given an agency the power to adopt legal norms via formal rule-making or administrative adjudication, the court must accept action within the scope of the delegated power the same way it accepts legislation.
 
 
 34
 . Respect. When the statute tells the executive branch to achieve a goal, the choices made in pursuit of that objective are political in nature. The President rather than a judge decides how to execute the laws, and a court therefore must respect the discretionary choices a coordinate branch of government has made in the course of implementation.
 
 
 35
 . Persuasion. On a "pure" question of law, an agency's views may persuade when they cannot compel. To the extent statutory text and structure are conclusive on the issue of meaning, an agency may persuade by illuminating how the pieces of the statute fit together. To the extent other factors (collectively "legislative intent") matter, the agency may have better access to indicators of this intent than do judges.
 
 
 36
 Using one word for three distinct subjects breeds confusion. Justice Breyer believes that it has done worse--that it sometimes has led courts to give more force to an agency's legal arguments (the "persuasion" category) than to the agency's choices about wise policy (the "respect" category), reversing the proper role of the political and judicial branches. Stephen Breyer, Judicial Review of Questions of Law and Policy, 38 Admin.L.Rev. 363 (1986).
 
 
 37
 Today's case shows how vocabulary affects analysis. The Federal Railway Administration has not been delegated either rulemaking or adjudicative power over the subject of hours of service. It therefore cannot demand obedience to its law-making choices after the fashion of Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). See Adams Fruit Co. v. Barrett, 494 U.S. 638, 110 S.Ct. 1384, 108 L.Ed.2d 585 (1990). But it does oversee implementation of the wages and hours laws (and much else of concern to railroads and their workers), and therefore not only may have persuasive thoughts about the interpretation of the laws but also may be entitled to make some choices about implementation.
 
 
 38
 When an agency seeks to persuade us that its legal analysis is correct, we pay attention to whether it has long-standing, consistent views, see Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944), for a legal interpretation adopted soon after the statute's enactment may be the best evidence of the meaning the words carried in the legal profession at the time. Alterations in the legal and cultural landscape may make the meaning hard to recover; a contemporaneous understanding captures much of value, while changes of position may reflect only a shift in views of sound policy and therefore do not assist in ascertaining the original meaning. See West Virginia University Hospitals, Inc. v. Casey, 499 U.S. 83, 100-02 & n. 7, 111 S.Ct. 1138, 1147-49 & n. 7, 113 L.Ed.2d 68 (1991). When, however, an agency offers a view about wise administration, a change in perspective may show that the agency is sensitive to the contemporary economic context--the railroad industry, for example, has undergone a revolution in the last 30 years--and therefore is doing its job. Applying the word "deference" to both respect and persuasion implies that consistency of administrative views always cuts in favor of the agency's position. Yet consistency ought to matter only when the agency is seeking to persuade--and even then only when the consistent interpretation offers us a view into the understanding of the original interpretative community. See EEOC v. Arabian American Oil Co., 499 U.S. 244, 259-60, 111 S.Ct. 1227, 1236-37, 113 L.Ed.2d 274 (1991) (Scalia, J., concurring); Mayburg v. Secretary of HHS, 740 F.2d 100, 105-07 (1st Cir.1984) (Breyer, J.). See also Thomas W. Merrill, Textualism and the Future of the Chevron Doctrine, 72 Wash.U.L.Q. 351 (1994); Cass R. Sunstein, Law and Administration After Chevron, 90 Colum.L.Rev. 2071, 2101-04 (1990).
 
 
 39
 Taking "deference" as a unitary concept, my colleagues observe that the FRA has changed positions, and they conclude that its position is therefore not entitled to deference. I look at this differently. If the question is the way 45 U.S.C. Sec. 61(b) treats deadhead transportation at the end of duty, then consistency is informative--and the FRA has been consistent. Ever since 1907, when the Hours of Service Act came into being, the FRA and its predecessors have believed that time between the end of work and arrival at a place of rest does not count as time on duty. The agency adhered to this position immediately after the 1969 amendments and has not wavered. The published statement that we review, 58 Fed.Reg. 18163-66 (Apr. 8, 1993), reiterates this position, stating that the FRA disagrees with the legal analysis of United Transportation Union v. Skinner, 975 F.2d 1421 (9th Cir.1992). To the extent the question at hand is "Does 45 U.S.C. Sec. 62(b) treat time after the crew is relieved of work on the train as time 'on duty'?", the FRA has been consistent; and to the extent stability lends persuasive force to its position, we should be falling into line.
 
 
 40
 After reaching a judgment about the interpretation of the Hours of Service Act, the FRA reached a second judgment--about the desirability of uniform application. It told the ninth circuit, announced in the Federal Register, and now has told us, that a single national rule is superior given the integrated nature of the national railroad system. Once again the agency has been consistent. Its views about the benefits of uniformity induced it to put the ninth circuit's interpretation into force nationwide, despite its belief that the ninth circuit got the law wrong. If the combination of the two can be called a flip-flop (on the ground that the FRA now is administering the Act differently), the change is attributable to the malleable legal landscape. Agencies ought to respond to legal and economic changes rather than to plow on as if nothing had happened. In making a judgment that a uniform rule is preferable to subjecting the railroads (and perhaps particular crews) to multiple legal schemes, the agency has adopted a position on sound administration. We must decide whether this is the type of decision that deserves our respect.
 
 
 41
 To change the terminology, the FRA decided to acquiesce in the ninth circuit's interpretation. It thought that litigation should come to an end without the complicated dance that generates a conflict among the circuits and so propels the subject onto the Supreme Court's agenda. The FRA believes that on this subject it is "more important that the applicable rule of law be settled than that it be settled right." Burnet v. Coronado Oil & Gas Co., 285 U.S. 393, 406, 52 S.Ct. 443, 447, 76 L.Ed. 815 (1932) (Brandeis, J., dissenting). Courts regularly denounce agencies for not following judicial interpretations, so it is a little surprising to see the FRA boxed about the ears for complaisance. Agencies stick to their guns when they believe the difference in legal positions or practical consequences important; but if they think that the arguments are closely balanced or the practical consequences of the two positions similar, they may conclude that one case is enough--especially if they think that the Solicitor General would not deem the subject sufficiently important to justify a petition for certiorari. If the Solicitor General declines to seek, or the Supreme Court declines to grant, further review, then nonacquiescence may yield entrenched differences among the circuits. We know from United States v. Mendoza, 464 U.S. 154, 104 S.Ct. 568, 78 L.Ed.2d 379 (1984), that the executive branch need not follow a circuit's interpretation, even within that circuit's borders. See also Samuel Estreicher & Richard L. Revesz, Nonacquiescence by Federal Administrative Agencies, 98 Yale L.J. 679 (1989); cf. Thomas W. Merrill, Judicial Opinions as Binding Law and as Explanations for Judgments, 15 Cardozo L.Rev. 43 (1993). But an agency prudently may decide to acquiesce, to reduce uncertainty and the costs of both the legal process and compliance with multiple standards, a particular problem for firms with peripatetic operations.
 
 
 42
 When an agency declines to acquiesce, a court does not "defer" to this decision. A person aggrieved by the agency's decision to fight like a tiger is entitled to judicial review. The court construes the statute after an independent inquiry, and the agency prevails only if it has the stronger argument on the merits. Just so with acquiescence. A party aggrieved by the agency's decision to throw in the towel may protest and obtain an independent decision. Acquiescence and nonacquiescence are mirror images when each produces winners and losers in the private sector. If courts review nonacquiescence decisions without a thumb on the scale in favor of the agency's choice, they must review acquiescence decisions independently. Mendoza itself supplies a strong argument: additional litigation may lead to a conflict among the circuits and review by the Supreme Court with the benefit of additional legal views that increase the probability of a correct disposition. Today's decision may well lead the Supreme Court to address the question. An agency may be wise in thinking that national uniformity is highly desirable. When acquiescence affects only the public fisc (when, for example, the IRS accepts a decision that reduces collections), the agency's decision is dispositive; it is an exercise of the President's power to execute the laws. When private rights exist on both sides, the agency's decision one way or the other on acquiescence is contestable in order to hold the balance true among the private interests.
 
 
 43
 Whenever this court decides whether to create a conflict among the circuits, it makes a decision about the benefits of uniformity versus accuracy no different in principle or effect from the decision the FRA made about the Hours of Service Act. When the Supreme Court decides to let a conflict simmer, or to grant plenary review, it makes a similar decision. Nationwide implementation of the decision of the first circuit to encounter a question is not, therefore, the sort of executive prerogative to which a court owes the respect that it must accord the executive's decision about sound administration of the law. It is a subject on which judges are free to exercise their own judgment, when a party aggrieved by the agency's decision complains. I therefore agree with my colleagues that we need not "defer" to the FRA's acquiescence position. We ought, however, to grant some persuasive force to its consistent view of the meaning of the law. This brings us out in the same place, and, with a few exceptions, for the same reasons. I therefore join not only the court's judgment but also its opinion, except for the discussion of deference at pages 441-43.
 
 
 
 *
 The Honorable Walter J. Cummings did not participate in the argument or decision in this case
 
 
 [1]
 The railroads apparently modeled their Petition after the type described in 5 U.S.C. Sec. 553(e). As we shall soon see, agencies such as the FRA, who promulgate only "interpretive rules," are not subject to such Petitions
 
 
 [2]
 It is not necessary that we parse out which of the three agency communications of its decision to change its interpretation of the Act constitutes a "final agency action." The railroads timely filed petitions in response to all three agency missives, each of which presents the sole issue in this case. Obviously, the FRA's publication of its decision in the Federal Register was the communication of the most official character, but this publication, as well as the first letter to the railroads and the letter rejecting the railroads' Petition for Interpretation, demonstrate that the agency had completed its decisionmaking. Thus, the jurisdictional dictates are clearly satisfied
 
 
 [3]
 United States v. Coleman, 38 F.3d 856 (7th Cir.1994) (in conflict with United States v. Carillo, 991 F.2d 590 (9th Cir.1993)), and United States v. Michelle's Lounge, 39 F.3d 684 (7th Cir.1994) (in conflict with United States v. Consiglio, 866 F.2d 310 (9th Cir.1989)), are but two recent examples of disagreements with the Ninth Circuit
 
 
 [4]
 We do not address in this case the situation in which an outlawed crew is called upon to perform additional, non-operational, duties during and after its twelve-hour shift. The statute accounts for that circumstance; in instances in which additional duties are commingled with those of operating a train, the entire time spent by the crew is considered time on duty. 45 U.S.C. Sec. 62(b)