

1995 Decisions

7-25-1995

# Blackwell Health Center v Knoll

Precedential or Non-Precedential:

Docket 94-1954

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"Blackwell Health Center v Knoll" (1995). *1995 Decisions.* Paper 193.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/193

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


No. 94-1954


ELIZABETH BLACKWELL HEALTH CENTER FOR WOMEN;
GREATER PHILADELPHIA WOMEN'S MEDICAL FUND;
CHOICE, on behalf of themselves and the Medicaid-eligible
women of the Commonwealth of Pennsylvania to whom they
provide financial, health care and counseling services

v.

CATHERINE BAKER KNOLL, Treasurer of the Commonwealth of
Pennsylvania, in her official capacity; KAREN F. SNIDER,
Secretary of Public Welfare of the Commonwealth of
Pennsylvania, in her official capacity;
SHERRY KNOWLTON, Deputy Secretary of the Office of
Medical Assistance of the Commonwealth of Pennsylvania,
in her official capacity; ROBERT P. CASEY, Governor of
the Commonwealth of Pennsylvania, in his official capacity,
and their successors

Catherine Baker Knoll, Karen F. Snider,
Sherry Knowlton and Robert P. Casey,

Appellants


On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 94-cv-00169)


Argued January 13, 1995

Before:  COWEN, NYGAARD and ALITO,
         Circuit Judges

(Filed July 25, 1995)


Sandra W. Stoner (argued)
Office of Attorney General
 of Pennsylvania
Strawberry Square



1

15th Floor
Harrisburg, PA  17120
        COUNSEL FOR APPELLANTS
        Catherine Baker Knoll
        Karen Snider
        Sherry Knowlton
        Robert P. Casey


Mary A. McLaughlin (argued)
Dechert, Price & Rhoads
1717 Arch Street
4000 Bell Atlantic Tower
Philadelphia, PA  19103

        COUNSEL FOR APPELLEES
        Elizabeth Blackwell Health
          Center for Women
        Greater Philadelphia Women's
          Medical Fund
        CHOICE, on behalf of themselves
          and the Medicaid-eligible women
          of the Commonwealth of Pennsylvania
          to whom they provide financial, health
          care and counseling services

Frank W. Hunter
        Assistant Attorney General
Michael R. Stiles
        United States Attorney
Barbara C. Biddle
Alfred Mollin
        Attorneys, Appellate Staff
        Civil Division, Room 3127
        Department of Justice
        Washington, D.C.  20530-0001

        COUNSEL FOR THE UNITED STATES
        AS AMICUS CURIAE

**OPINION**


COWEN, <u>Circuit</u> <u>Judge</u>.

The Elizabeth Blackwell Health Center for Women, a comprehensive reproduc health care facility that provides first-trimester abortions, the Greater Women's M Fund, a non-profit agency that provides financial assistance to low-income women in to obtain abortions, and CHOICE, a telephone hot-line which provides information an referrals to its callers on many issues, including family planning and abortion (collectively, the "Providers"), ask this Court to declare invalid and enjoin the enforcement of sections 3215(c) and 3215(j) of the Pennsylvania Abortion Control Ac Pa. Cons. Stat. Ann. §§ 3201-3220 (1983 & Supp. 1994), Pennsylvania's reporting and physician certification requirements for publicly-funded abortions under the Medica program. The Governor of Pennsylvania, the State Treasurer, the Secretary of the Pennsylvania Department of Public Welfare, and the Deputy Secretary for Medical Ass (collectively, "the Commonwealth") appeal from the order of the district court gran the Providers' motion for summary judgment. The district court based its holding c Providers' claim that the Pennsylvania statute is preempted by the Hyde Amendment.

We conclude that the Secretary of Health and Human Services is owed defer regarding her interpretation of the Hyde Amendment mandates. Because the Secretary determined that reporting requirements are permissible under the Medicaid Act, as n by the Hyde Amendment, only if they contain a waiver provision, and since the Penns Abortion Control Act contains no such provision, we find § 3215(j) of the Pennsylva statute directly in conflict with federal law, and thus, invalid to the extent that conflicts with the Secretary's interpretation. Furthermore, because the second-phy certification requirement pursuant to § 3215(c) is contrary to a federal regulation also invalid to the extent that it goes beyond the scope of that regulation.

I.

This action concerns Title XIX of the Social Security Act, commonly known

Medicaid program, 42 U.S.C. §§ 1396-1396u (1988 & Supp. V 1993).  The purpose of th

Medicaid program is to help provide medical treatment for low-income people. Under

program, the state receives federal financial assistance in return for administerin

Medicaid program that the state develops within parameters established by federal l

regulations.  42 C.F.R. § 430.0 (1994).

Establishment of a Medicaid program is voluntary on the part of each stat

While states are not obligated to participate in the Medicaid program, each state t

chooses to do so is required to develop its own state plan which must be approved b

Secretary.  In order to receive federal funds, a state's plan must conform, both on

face and as applied, with various federal requirements.  42 U.S.C. § 1396a, 1396c;

Harris v. McRae, 448 U.S. 297, 301, 100 S. Ct. 2671, 2680 (1980); New Jersey v. Dep

of Health and Human Services, 670 F.2d 1284, 1286 (3d Cir.), cert. denied, 459 U.S.

103 S. Ct. 56 (1982).

Under Title XIX, certain categories of medical care are mandatory, and mu

provided by every state Medicaid plan, while other categories of care are optional,

each state has the discretion to cover the service.  See 42 U.S.C. §1396a(a)(10).

states are required to fund medically necessary physician services.  42 U.S.C. §§

1396a(a)(10)(A), 1396d(a).  Participating states must establish eligibility require

that are "consistent with the objectives" of Title XIX.  42 U.S.C. § 1396a(a)(17).

XIX's broadly stated primary objective [is] to enable each State, as far as practic

to furnish medical assistance to individuals whose income and resources are insuffi

to meet the costs of necessary medical services."  Beal v. Doe, 432 U.S. 438, 444,

Ct. 2366, 2371 (1977) (citing 42 U.S.C. §§ 1396, 1396a(a)(10)).  "A further objecti

that policies governing eligibility be in the 'best interests' of the recipient."  H

v. Board of County Commissioners, County of Hennepin, 614 F.2d 601, 607 (8th Cir. 1

4

(citing 42 U.S.C. § 1396a(a)(19); 45 C.F.R. § 206.10(a)(11)).  The state must also

safeguards to assure that its Medicaid plan will be administered "in a manner consi

with simplicity of administration."  42 U.S.C. § 1396a(a)(19).  On the other hand,

state must "provide such methods and procedures relating to the utilization of, and

payment for, care and services available under the plan . . . as may be necessary t

safeguard against unnecessary utilization."  42 U.S.C. § 1396a(a)(30)(A).

In addition, federal regulations require that each covered service be

"sufficient in amount, duration, and scope to reasonably achieve its purpose,"  42

§ 440.230(b) (1994), and mandate that states "may not arbitrarily deny or reduce th

amount, duration, or scope of a required service . . . to an otherwise eligible rec

solely because of the diagnosis, type of illness, or condition."  42 C.F.R. § 440.2

If, after a hearing, the Secretary finds that an approved state plan no l

complies with the provisions of the Medicaid Act, or that the state had failed to c

substantially with any applicable federal requirement, the Secretary may notify the

that federal financial participation will be withheld or limited.  42 U.S.C. § 1396

In 1976, Congress passed what is commonly called the Hyde Amendment, whic

prohibits federal reimbursement for abortions except in the narrow circumstances th

Congress deems to be medically necessary.  Since 1976, Congress has added the Hyde

Amendment to annual appropriations bills for the U.S. Department of Health and Huma

Services ("HHS").  While its provisions have varied to some degree from year to yea

effect of the Hyde Amendment has been to withdraw federal funding under Medicaid fo

abortions.[0]

---

[0]The original Hyde Amendment, enacted in 1976, limited federal funding to abortions
"the life of the mother would be endangered if the fetus were carried to term."  Pu
No. 94-439, § 209, 90 Stat. 1418, 1434 (1976).  The Hyde Amendment for the followin
fiscal year expanded the funding to include abortions for victims of rape and inces
well as "instances where severe and long-lasting physical health damage to the moth
would result if the pregnancy were carried to term when so determined by two physic
Pub. L. No. 95-205, § 101, 91 Stat. 1460 (1977).  From that year through 1981, the
Amendment provided for reimbursement for abortions when a pregnancy resulted from r

5

The Hyde Amendment for fiscal year 1994 permitted, for the first time sin

1981, expenditure of federal funds for abortions when "the pregnancy is the result

act of rape or incest" as well as when "necessary to save the life of the mother."

L. No. 103-112, § 509, 107 Stat. 1082, 1113 (1993).  The full version of the 1994 H

Amendment provides:

> None of the funds appropriated under this Act shall be expended for
> any abortion except when it is made known to the Federal entity or
> official to which funds are appropriated under this Act that such
> procedure is necessary to save the life of the mother or that the
> pregnancy is the result of an act of rape or incest.

Id.[0]

This Court has previously held that the Medicaid statute, as modified by

Hyde Amendment, requires participating states to fund those abortions for which fed

reimbursement is available.  Roe v. Casey, 623 F.2d 829, 836-37 (3d Cir. 1980).  Se

Hodgson, 614 F.2d at 605; Preterm, Inc. v. Dukakis, 591 F.2d 121, 134 (1st Cir.), c

denied, 441 U.S. 952, 99 S. Ct. 2182 (1979).  We are bound by that precedent here.

Accordingly, under Medicaid, funding for rape and incest abortions is mandatory for

participating states.

The 1994 Hyde Amendment was reported out of committee with a provision re

women seeking reimbursement for rape and incest abortions to report the crimes to t

appropriate law enforcement officials.  139 Cong. Rec. H4304 (daily ed. June 30, 19

207).  However, a point of order was raised that the Hyde Amendment language violat

parliamentary procedure of the House of Representatives, which prohibits attempts t

"legislate" on an appropriations bill.  The point of order was conceded and the ent

amendment stricken from the bill.  139 Cong. Rec. H4307-08.

---

incest.  The rape and incest provision was eliminated from the Hyde Amendment from
until the appropriations bill for fiscal year 1994.
[0]The 1995 Hyde Amendment is identical in language to the 1994 version.  Pub. L. No.
333, § 509, 108 Stat. 2539, 2573 (1994).

The Secretary of HHS has delegated her authority to oversee and enforce t

Medicaid program to the Health Care Financing Administration ("HCFA").  49 Fed. Reg

35,247, 35,249 (1984).  HCFA has promulgated a regulation that provides:

> [Federal funding] is available in expenditures for an abortion when a
> physician has found, and certified in writing to the Medicaid agency,
> that on the basis of his professional judgment, the life of the mother
> would be endangered if the fetus were carried to term.

42 C.F.R. § 441.203 (1994).

In addition, on December 28, 1993, HCFA issued a directive to state Medic

directors, explaining:

> The purpose of this letter is to notify [state Medicaid directors]
> about a recent Congressionally enacted revision to the "Hyde
> Amendment" which affects the Medicaid program and to tell you how this
> revision in the law is to be implemented.
>      . . . .
> As with all other mandatory medical services for which Federal funding
> is available, States are required to cover abortions that are
> medically necessary.  By definition, abortions that are necessary to
> save the life of the mother are medically necessary.  In addition,
> Congress this year added abortions for pregnancies resulting from rape
> and incest to the category of medically necessary abortions for which
> funding is provided. Based on the language of this year's Hyde
> Amendment and on the history of Congressional debate about the
> circumstances of victims of rape and incest, we believe that this
> change in the text of the Hyde Amendment signifies Congressional
> intent that abortions of pregnancies resulting from rape or incest are
> medically necessary in light of both medical and psychological health
> factors.  Therefore, abortions resulting from rape or incest should be
> considered to fall within the scope of services that are medically
> necessary.
>
> The definition of rape and incest should be determined in accordance
> with each State's own law.  States may impose reasonable reporting or
> documentation requirements on recipients or providers, as may be
> necessary to assure themselves that an abortion was for the purpose of
> terminating a pregnancy caused by an act of rape or incest.  States
> may not impose reporting or documentation requirements that deny or
> impede coverage for abortions where pregnancies result from rape or
> incest.  To insure that reporting requirements do not prevent or
> impede coverage for covered abortions, any such reporting requirement
> must be waived and the procedure considered to be reimbursable if the
> treating physician certifies that in his or her professional opinion,
> the patient was unable, for physical or psychological reasons, to
> comply with the requirement.

. . . .

By March 31, 1994, all States must ensure that their State Plans do not contain language that precludes [federal funding] for abortions that are performed to save the life of the mother or to terminate pregnancies resulting from rape or incest.

Letter, from Sally K. Richardson, Director, Medicaid Bureau, to All State Medicaid Directors (Dec. 28, 1993) (emphasis added), App. at 92-93.

However, under the Pennsylvania Abortion Control Act, no federal or state [funds] can be provided for the termination of pregnancies caused by rape or incest unless [the] state agency: (1) obtains a statement from the physician performing the abortion th[at the] woman was a victim of rape or incest and that she personally reported the crime to [the] appropriate law enforcement agency together with the name of the offender; (2) obta[ins] from the physician the woman's signed statement to that effect; and (3) verifies th[e] reporting of the crime with the appropriate law-enforcement agency. 18 Pa. Cons. S[tat.] Ann. § 3215(j) (Supp. 1994). The Pennsylvania Abortion Control Act does not conta[in a] waiver provision.

---

HCFA reaffirmed its position regarding the Hyde Amendment in another letter to sta[te] Medicaid Directors, which stated:

> HCFA will not establish a timeframe within which cases of rape or incest must be reported to a law enforcement or other agency. State law or policy should dictate when and to whom a rape or a case of incest must be reported. However, as noted in my December 28 letter, the State-established reporting requirements may not serve as an additional coverage requirement to deny or impede payment for abortions where pregnancies result from rape or incent (sic).
>
> The State must establish procedures which permit the reporting requirements to be waived, and the procedure reimbursed, if the treating physician certifies that, in his or her professional opinion, the patient was unable, for physical or psychological reasons, to comply with the reporting requirements.

Letter, from Sally K. Richardson, Director, Medicaid Bureau, to All State Medicaid Directors (Mar. 25, 1994) (emphasis added), App. at 116-17.

Section 3215(j) of the Pennsylvania Abortion Control Act provides:

> No Commonwealth agency shall make any payment from Federal or State funds appropriated by the Commonwealth for the performance of any

8

In addition, in cases where carrying the fetus to term would endanger the

of the mother, the Pennsylvania Act provides that no state or federal funds can be

expended unless the danger is certified by a physician who is not the physician who

perform the abortion and who has no financial interest in the procedure.  18 Pa. C

Stat. Ann. § 3215(c) (Supp. 1994).[0]

---

abortion pursuant to subsection (c)(2) or (3) unless the Commonwealth
agency first:

(1) receives from the physician or facility seeking payment
a statement signed by the physician performing the abortion
stating that, prior to performing the abortion, he obtained
a non-notarized, signed statement from the pregnant woman
stating that she was a victim of rape or incest, as the case
may be, and that she reported the crime, including the
identity of the offender, if known, to a law enforcement
agency having the requisite jurisdiction or, in the case of
incest where a pregnant minor is the victim, to the county
child protective service agency and stating the name of the
law enforcement agency or child protective service agency to
which the report was made and the date such report was made;

(2) receives from the physician or facility seeking payment,
the signed statement of the pregnant woman which is
described in paragraph (1).  The statement shall bear the
notice that any false statements made therein are punishable
by law and shall state that the pregnant woman is aware that
false reports to law enforcement authorities are punishable
by law; and

(3) verifies with the law enforcement agency or child
protective service agency named in the statement of the
pregnant women whether a report of rape or incest was filed
with the agency in accordance with the statement.

The Commonwealth agency shall report any evidence of false statements,
of false reports to law enforcement authorities or of fraud in the
procurement or attempted procurement of any payment from Federal or
State funds appropriated by the Commonwealth pursuant to this section
to the district attorney of appropriate jurisdiction and, where
appropriate, to the Attorney General.

18 Pa. Cons. Stat. Ann. § 3215(j).

[0]Section 3215(c) of the Pennsylvania Abortion Control Act provides, in pertinent pa

9

The Providers commenced this challenge to sections 3215(c) and 3215(j) of
Pennsylvania Abortion Control Act, on their own behalf and on behalf of Medicaid-el
rape and incest victims and Medicaid-eligible women whose lives are endangered but
cannot obtain second-physician certification. The Providers argued in the district
that the Commonwealth's reporting and certification requirements are inconsistent w
Hyde Amendment, and therefore invalid under the Supremacy Clause of the United Stat
Constitution.[0]

The district court granted the Providers' motion for summary judgment on
Supremacy Clause claim. Elizabeth Blackwell Health Center for Women v. Knoll, No.
0169, slip op. at 5 (E.D. Pa. Sept. 15, 1994). Relying on our decision in Roe v. C
623 F.2d 829 (3d Cir. 1980), the district court first acknowledged that Pennsylvani

> No Commonwealth funds and no Federal funds which are appropriated by
> the Commonwealth shall be expended by any State or local government
> agency for the performance of abortion, except:
>
> > (1) When abortion is necessary to avert the death of the
> > mother on certification by a physician.  When such physician
> > will perform the abortion or has a pecuniary or proprietary
> > interest in the abortion there shall be a separate
> > certification from a physician who has no such interest.
> >
> > (2) When abortion is performed in the case of pregnancy
> > caused by rape which, prior to the performance of the
> > abortion, has been reported, together with the identity of
> > the offender, if known, to a law enforcement agency having
> > the requisite jurisdiction and has been personally reported
> > by the victim.
> >
> > (3) When abortion is performed in the case of pregnancy
> > caused by incest which, prior to the performance of the
> > abortion, has been personally reported by the victim to a
> > law enforcement agency having the requisite jurisdiction,
> > or, in the case of a minor, to the county child protective
> > service agency and the other party to the incestuous act has
> > been named in such report.

18 Pa. Cons. Stat. Ann. § 3215(c).
[0]The providers also challenged the second-physician certification provision as viol
of Title XIX and the Due Process Clause of the Fourteenth Amendment.  The district
did not address these additional claims.

10

cover all abortions for which federal reimbursement is provided under the Hyde Amer

The court then reasoned:
> whereas the Hyde Amendment restricts abortion funding to cases of rape or incest, or where continuation of the pregnancy would endanger the life of the mother, the Pennsylvania statute imposes additional limitations. To the extent of these additional limitations, therefore, the Pennsylvania statute is invalid, under familiar pre-emption principles.

Id. at 3.

The district court also found support for its holding in the fact that "t kinds of reporting and certification requirements set forth in the Pennsylvania sta had appeared in earlier versions of the Hyde Amendment. They were removed in the c version, and efforts by abortion opponents to include them were rejected by Congres Id. at 4 (citation omitted). The district court thus concluded that the legislative history indicates congressional intent to eliminate the reporting requirements. Id Further, the district court also held that the crime-fighting and other interests a by the Commonwealth to justify the challenged provisions were inconsistent with the purposes of the Medicaid Act and were therefore impermissible. Id. at 4.

The district court enjoined the Commonwealth from enforcing sections 3215 3215(j) of the Pennsylvania Abortion Control Act. This appeal followed. This Cour granted the Commonwealth's motion to stay the order of the district court pending a and the Providers' request to expedite this appeal. We requested the Secretary of address as amicus the issue of the extent to which a state can require reporting ar second-physician certification under the Medicaid Act and the Hyde Amendment in orc a woman to be entitled to an abortion.

## II. REPORTING REQUIREMENTS FOR RAPE OR INCEST

The Secretary of HHS, who administers the Medicaid program, has interpret Medicaid statute as modified by the 1994 Hyde Amendment, to provide that, absent a

11

provision, reporting requirements for rape or incest abortions unduly impede or det

woman's exercise of her right to the medically necessary procedure. Letter, (Dec.

1993), App. at 93; Letter, (Mar. 25, 1994), App. at 117. The Secretary does not re

reporting requirements as per se invalid. Id. If this judgment is a reasonable ex

of the Secretary's discretion, it is entitled to due deference. Our inquiry is the

focused upon whether the Secretary's interpretation warrants our deference.

## A.

The Commonwealth disputes both the Secretary's and the district court's

interpretations of the Hyde Amendment mandates regarding reporting requirements. T

Commonwealth maintains that its requirements are valid and should be upheld in thei

entirety.

The Commonwealth acknowledges that under the Medicaid program, states are

to participate or not as they see fit, but if a state does elect to participate, it

comply with the conditions that Congress has set. The Commonwealth, however, citin

Pennhurst State School and Hospital v. Halderman, 451 U.S. 1, 17, 101 S. Ct. 1531,

(1981), argues that in setting those conditions, "Congress [must] speak with a clea

voice." It contends that a program like Medicaid:
> is much in the nature of a contract: in return for federal funds, the
> States agree to comply with federally imposed conditions . . . .
> There can, of course, be no knowing acceptance if a State is unaware
> of the conditions or is unable to ascertain what is expected of it.
> Accordingly, if Congress intends to impose a condition on the grant of
> federal moneys, it must do so unambiguously. [Pennhurst, 451 U.S. at
> 17, 101 S. Ct. 1540 (citation and footnote omitted).]

The Commonwealth maintains that on its face, the 1994 Hyde Amendment is a

prohibition on the use of federal money for certain specified purposes. It sets ne

requirements nor prohibitions on the states; it says nothing explicit about reporti

certification procedures. The Commonwealth concludes that the principles articulat

Pennhurst, when applied to this case, require that the district court's holding be

12

reversed because it cannot reasonably be said that Congress has "unambiguously" for

reporting and certification requirements such as those contained in the Pennsylvani

The Commonwealth's reliance on Pennhurst is misplaced. Pennhurst involved

obligations of states under the federal Developmentally Disabled Assistance and Bil

Rights Act, 42 U.S.C. §§ 6000-6081 ("DDABRA"). In reversing our holding that the '

rights" provision of the DDABRA created enforceable rights and obligations, the Sup

Court found no evidence that Congress intended to condition the grant of federal fu

the states' "assum[ing] the high cost of providing 'appropriate treatment' in the '

restrictive environment' to their mentally retarded citizens." 451 U.S. at 18, 101

at 1540. The Court reasoned that because Congress failed to speak clearly regarding

state's obligations, it could not "fairly say that the State could make an informed

choice" about participation in the joint program. Id. at 25, 101 S. Ct. at 1544.

Here, the Medicaid Act by its terms requires state Medicaid plans to cove

medically necessary services that fall within the mandatory areas of care. See 42

§1396a(a)(10)(A). Moreover, nearly fifteen years ago, we made clear in Roe v. Case

states participating in the Medicaid program must provide the abortion services tha

enumerated in the Hyde Amendment. 623 F.2d at 836-37. The 1994 Hyde Amendment pla

puts participating states on notice of their obligations to fund abortions where ne

to save a woman's life or where the pregnancy is the result of rape or incest.

Accordingly, the Commonwealth was given clear notice that, if it elected to continu

participate in the Medicaid program, it was obligated to provide funding for such

abortions. Furthermore, any participating state should have realized that reportin

requirements could be so onerous as to defeat Congress' intent that Medicaid fundin

provided for the categories of abortions in question. Unlike the claims of the def

in Pennhurst, the Commonwealth cannot reasonably claim that it was unaware of its

obligations under the Medicaid Act, as modified by the Hyde Amendment and its imple

regulations. As such, the Secretary is reasonable in interpreting the Hyde Amendme

13

prohibit reporting requirements that operate as additional coverage requirements to or impede some women from receiving the mandated abortion services.

The Commonwealth further maintains that other provisions of Title XIX aut the challenged provisions. Participating states are required to adopt "reasonable standards . . . for determining eligibility for and the extent of medical assistanc U.S.C. § 1396a(a)(17). States are likewise required to adopt "such safeguards as n necessary to assure that eligibility for care and services under the plan will be determined, and such care and services will be provided, in a manner consistent wit simplicity of administration and the best interests of the recipients." 42 U.S.C. 1396a(a)(19). Additionally, states must "provide such methods and procedures relati the utilization of, and the payment for, care and services available under the plan as may be necessary to safeguard against unnecessary utilization." 42 U.S.C. §1396a(a)(30)(A). Moreover, the current version of the Hyde Amendment requires sta "make known" to the Secretary that the abortion for which funding is sought is one which the life of the mother is endangered or where the pregnancy resulted from ra incest. The Commonwealth argues that Pennsylvania's reporting and certification procedures further these statutory mandates.

In her amicus brief, the Secretary acknowledges that Congress intended th states be allowed flexibility in developing procedures for administering their stat obligations under the Medicaid statute and their state plans. Amicus Brief at 20 (c Schweiker v. Hogan, 457 U.S. 569, 590-93, 102 S. Ct. 2597, 2610-11 (1982) (a state option to provide partial benefits to the medically needy); Mississippi Hospital As Inc. v. Heckler, 701 F.2d 511, 515 (5th Cir. 1983) (Congress intended states to be experiment with methods and standards of payment under their Medicaid plans)). The Secretary's regulations have long recognized that states have discretion to impose reasonable coverage limits, consistent with the objectives of the Act, on the amoun duration, and scope of services, particularly with respect to ensuring "utilization

14

control."  42 C.F.R. § 440.230(b), (d).  Indeed, the Secretary acknowledges that wh

states are not required to adopt reporting requirements, properly tailored reportin

requirements can serve the purposes of the Medicaid Act and the Hyde Amendment.

However, in reconciling these eligibility requirements of the Medicaid st

with the language and history of the Hyde Amendment, and with the other purposes of

Medicaid program, the Secretary maintains that state-established reporting requirem

"may not serve as an additional coverage requirement to deny or impede payment for

abortions where pregnancies result from rape or ince[s]t."  Letter, (Mar. 25, 1994)

at 117. The Secretary has thus concluded that reasonable reporting requirements are

only if they contain a waiver provision.


B.

The Providers argue that the district court correctly held that the Supre

Clause requires the invalidation of Pennsylvania's reporting and second-physician

certification requirements because they directly conflict with federal law. The Sup

Clause requires invalidation of any state constitutional or statutory provision tha

conflicts with federal law, see Reynolds v. Sims, 377 U.S. 533, 584, 84 S. Ct. 1362

(1964), and compels compliance by participants in Title XIX federal aid programs wi

federal law and regulations.  King v. Smith, 392 U.S. 309, 316-17, 88 S. Ct. 2128,

(1968); Roe v. Casey, 623 F.2d at 837.

The Providers maintain that the district court properly relied on Roe v.

in holding that all state Medicaid programs must fund all abortions for which feder

funds are available.  In Roe v. Casey, we invalidated an earlier version of Pennsyl

Medicaid funding restriction that proscribed coverage of abortions except when nece

to save the life of the pregnant woman.  The then-applicable Hyde Amendment, like t

Hyde Amendment, permitted the expenditure of funds for abortion where a pregnancy r

from rape or incest, as well as in life-threatening circumstances.  We reasoned:

15

> Title XIX, as now modified [by the current Hyde Amendment], requires the states to fund abortions in two categories: where the mother is endangered and where the pregnancy was the result of rape or incest. Pennsylvania . . . would not fund the second category. Because Pennsylvania's statutes are not consistent with the modified Title XIX it is clear that, as written, they cannot stand.

Id. at 836-37.

The Providers argue that the district court correctly concluded that Pennsylvania's effort to restrict its Medicaid coverage of abortion to cases of rep rape and incest and dually-certified life endangerment runs directly contrary to Ro Casey's mandate that Pennsylvania must fund all abortions for which federal funds a available. According to the Providers, the Pennsylvania reporting requirements wou invalid under Roe v. Casey even if they contained a waiver provision.

We agree that Roe v. Casey holds that the Hyde Amendment establishes a ma floor of required services, below which states may not fall. Under its ruling, all who are eligible must receive the benefits that have been made available to them by Congress. The question with which we are faced today focuses on the issue of eligi requirements that are utilized by states to determine whether a woman is entitled t services enumerated in the Hyde Amendment. Roe v. Casey indicates that these eligi requirements cannot be so onerous that they inhibit or deter women who are eligible receive the abortion services from receiving them. Roe v. Casey does not, however, invalidate all reporting requirements used for eligibility purposes.

The Providers further argue that the legislative history provides a clear indication of congressional intent to prohibit the reporting and certification requirements contained in the Pennsylvania statute. The Providers note that in pas versions of the Hyde Amendment, Congress had specifically included reporting requir for rape and incest victims, and contained second-physician requirements for aborti cases of severe and long-lasting physical health damage. See Pub. L. No. 96-536, § 94 Stat. 3166, 3170 (1980) (1981 Hyde Amendment) (providing funding for rape or inc

16

victims "when such rape has been reported within seventy-two hours to a law enforce

agency or public health service"); Pub. L. No. 96-123, § 109, 93 Stat. 923, 926 (19

(1980 Hyde Amendment) (providing Medicaid funded abortions for rape or incest victi

"when such rape or incest has been reported promptly to a law enforcement agency or

health service"); Pub. L. No. 95-480, § 210, 92 Stat. 1567, 1586 (1978) (1979 Hyde

Amendment) (restricting Medicaid funding in cases of severe and long-lasting health

to those cases "so determined by two physicians"); Pub. L. No. 95-205, § 101, 91 St

1460 (1977) (1978 Hyde Amendment) (same). Additionally, in 1993, Congress considere

rejected a version of the 1994 Hyde Amendment that contained such a requirement. Se

Cong. Rec. H4304 (daily ed. June 30, 1993) (showing previous version of amendment w

included reporting requirement).  The Providers contend that the district court pro

inferred that, in repudiating previous versions of the Hyde Amendment, Congress cle

intended to eliminate provisions such as those at issue here.

The district court's reading of the legislative history goes too far.  Wh

Congress clearly no longer <u>requires</u> the states to implement reporting and certifica

procedures, it does not follow that states are now <u>forbidden</u> to have them.  At most

rejection of the earlier versions of the Hyde Amendment is a sign that Congress did

wish to mandate reporting requirements on the states.  <u>Cf.</u> <u>John Hancock Mutual Life</u>

<u>Co. v. Harris Trust & Sav. Bank</u>, __ U.S. __, 114 S. Ct. 517, 526 (1993) (courts are

by the statute's words, not by discarded draft legislation).  Moreover, we note tha

Congress' rejection of the reporting requirements for the 1994 Hyde Amendment was

expressly based on procedural considerations.  <u>See</u> 139 Cong. Rec. H4307-08.  A reje

on procedural grounds provides no basis for any inference regarding Congress' views

the substantive provisions of the legislation.  We are therefore left with no guida

from the legislative history.


C.


17

We are thus faced with competing interests within the Medicaid statute as

amended by the 1994 Hyde Amendment.  On one hand, the Pennsylvania reporting requir

that require a physician's averment setting forth that the woman signed a statement

her pregnancy was the result of rape or incest can be defended on the ground that t

further the state's interest under the Hyde Amendment in being able to "make known"

Secretary that an abortion was performed upon a woman's representation that the pre

was the result of rape or incest.  The requirement under Pennsylvania law that a wo

report the rape or incest to law enforcement agencies can be defended as an attempt

ensure that the woman's representations are true as a part of the state's obligatio

"safeguard against unnecessary utilization."  42 U.S.C. § 1396a(a)(30)(A).

On the other hand, however, the Supreme Court has held that a state law t

establishes benefit eligibility criteria for a federal program that are more restri

than the criteria established by Congress is invalid.  King v. Smith, 392 U.S. 309,

88 S. Ct. 2128, 2141 (1968).  Likewise, our decision in Roe v. Casey sets a mandato

floor of services that must be provided by the states under the Medicaid Act, as mo

by the Hyde Amendment, which cannot be undermined by onerous reporting requirements

Furthermore, § 1369a(a)(19) requires that the state provide safeguards to assure th

plan will be administered "in a manner consistent with simplicity of administration

the best interests of the recipients."[0]

---

[0] The legislative history of this provision establishes that Congress added it to en
that states would not impose bureaucratic and complicated mechanisms for determinin
eligibility that would deter recipients from obtaining care.

> This provision was included in order to provide some assurance that
> the States will not use unduly complicated methods of determining
> eligibility which have the effect of delaying in an unwarranted
> fashion the decision on eligibility for medical assistance or that the
> States will not administer the provisions for services in a way which
> adversely affects the availability or the quality of the care to be
> provided. The committee expects that under this provision, the States
> will be eliminating unrewarding and unproductive policies and methods
> of investigation and that they will develop such procedures as will
> assure that the most effective working relationships with medical

18

It can reasonably be argued that the Pennsylvania reporting requirements
inconsistent with this mandate because they create a formidable barrier for some wo
would otherwise be eligible to obtain abortions in cases of rape and incest.  The
Pennsylvania statute creates numerous hurdles for rape and incest victims: (1) a wo
must personally report the incident of rape or incest to state law enforcement
authorities, together with the name of the offender; (2) physicians are required to
that they have obtained a signed statement from the pregnant woman verifying that s
pregnant as a result of rape or incest, that she complied with the reporting requir
and that she is aware that false reporting is punishable by law; and (3) the Common
must verify with a law enforcement agency or child protective service agency that t
report was made.  It can reasonably be argued that these requirements can be
insurmountable for a victim of rape or incest who may be traumatized by the event.
aware that rape is a vastly underreported crime, and it can be reasonably argued th
reporting requirements such as Pennsylvania's can substantially deter some women fr
receiving services intended to be available to them under the statute.

The Secretary of HHS bears the responsibility of reconciling these compet
interests in the statute.  The Supreme Court has noted that "[p]erhaps appreciating
complexity of what it had wrought, Congress conferred on the Secretary exceptionall
authority to prescribe standards for applying certain sections of the [Medicaid] Ac
Schweiker v. Gray Panthers, 453 U.S. 34, 43, 101 S. Ct. 2633, 2640 (1981). The Secr
has concluded that these competing interests are best reconciled if state reporting
requirements contain a waiver provision allowing a treating physician to certify th

---

facilities, practitioners, and suppliers of care and service in order
to encourage their full cooperation and participation in the provision
of services under the State plan.

S. Rep. No. 404, 89th Cong., 1st Sess. 76, reprinted in 1965 U.S.C.C.A.N. 1943, 201

woman was unable to comply with reporting requirements for physical or psychologica[

reasons.

The Director of HCFA explained this point in her December 1993 directive

state Medicaid directors:

> As with all other mandatory medical services for which Federal funding is available, States are required to cover abortions that are medically necessary . . . .  States may impose reasonable reporting or documentation requirements on recipients or providers, as may be necessary to assure themselves that an abortion was for the purpose of terminating a pregnancy caused by an act of rape or incest. States may not impose reporting or documentation requirements that deny or impede coverage for abortions where pregnancies result from rape or incest. To insure that reporting requirements do not prevent or impede coverage for covered abortions, any such reporting requirement must be waived and the procedure considered to be reimbursable if the treating physician certifies that in his or her professional opinion, the patient was unable, for physical or psychological reasons, to comply with the requirement.

Letter, (Dec. 28, 1993), App. at 93.  See also Letter, (Mar. 25, 1994), App. at 11[

(reiterating the need for waiver provision in state-established reporting requireme[

Under the Secretary's interpretation, physicians may take into account bo[

immediate and long-term psychological consequences of reporting rape or incest to

authorities that could leave a woman unable to fulfill those reporting requirements[

waiver thus ensures that reporting requirements do not prevent or impede coverage f[

covered abortions.  Without Pennsylvania's assurance that it will waive the reporti[

requirements if the woman is physically or psychologically unable to comply, the

Pennsylvania Abortion Control Act requirements comprise impermissible eligibility

criteria.

The December 1993 HCFA directive constituted the Secretary's attempt to g[

interpretive guidance to the states in advance of their submission of state Medicai[

plans.[0]  The HCFA directive is an interpretation of the Hyde Amendment mandates as [

_____

[0]We are aware of the related action, Ridge v. Shalala, No. 94-7751, which is curren[
pending in this Court, in which the Commonwealth is challenging HHS's "waiver" requ[

20

reconciled with the competing interests within the Medicaid statute.  Since the dir

clarifies and explains existing law, we deem it "interpretive."  See Bailey v. Sull

885 F.2d 52, 62 (3d Cir. 1989) ("If the rule in question merely clarifies or expla

existing law or regulations, it will be deemed interpretive."); American Min. Congr

MSHA, 995 F.2d 1106, 1112 (D.C. Cir. 1993) (setting out factors to distinguish betw

legislative and interpretive rules).  As an interpretive rule, the Secretary's

pronouncements are exempted from the APA notice-and-comment requirements.  5 U.S.C.

553(b)(A) (notice requirement does not apply "to interpretive rules, general statem

policy, or rules of agency organization, procedure, or practice").  This Court and

Supreme Court have upheld the validity of interpretive rules.  Bailey, 885 F.2d at

Shalala v. Guernsey Memorial Hospital, __ U.S. __, 115 S. Ct. 1232, 1237 (1995).

Courts have long recognized that "considerable weight" must be conferred

executive department's construction of a statutory scheme which it is entrusted to

administer.  The Supreme Court has announced that the principle of deference to

administrative interpretation:

> has been consistently followed by this Court whenever decision as to
> the meaning or reach of a statute has involved reconciling conflicting
> policies, and a full understanding of the force of the statutory
> policy in the given situation has depended upon more than ordinary
> knowledge respecting the matters subjected to agency regulations . . .
> .  If this choice represents a reasonable accommodation of conflicting
> policies that were committed to the agency's care by the statute, we
> should not disturb it unless it appears from the statute or its
> legislative history that the accommodation is not one that Congress
> would have sanctioned.

Chevron, U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837, 844-45, 1

Ct. 2778, 2782-83 (1984) (citations omitted).  Such deference is appropriate here e

though the Secretary's interpretation is not contained in a "legislative rule."  Se

as violative of the Administrative Procedures Act.  The district court dismissed th
action on jurisdictional grounds because the Secretary has not yet called for a hea
nor issued a decision about the conformity of Pennsylvania's plan with the Hyde Ame
Casey v. Shalala, No. 94-390 (M.D. Pa. Nov. 28, 1994).

21

e.g., Health Insurance Ass'n of America v. Shalala, 23 F.3d 412, 424 (D.C. Cir. 199

Hicks v. Cantrell, 803 F.2d 789, 791-92 (4th Cir. 1986).  Indeed, the Supreme Court

recently reversed our decision in Reno v. Koray, 21 F.3d 558, 562-65 (3d Cir. 1994)

we had declined to defer to the Bureau of Prisons' interpretation of 18 U.S.C. § 35

The Supreme Court explained:

> The Bureau, as the agency charged with administering the credit
> statute . . . has interpreted § 3585(b)'s "official detention"
> language to require credit for time spent by a defendant under a §
> 3142(e) "detention order" . . . .  As we have explained, . . . the
> Bureau's interpretation is the most natural and reasonable reading of
> § 3585(b)'s "official detention" language.  It is true that the
> Bureau's interpretation appears only in a "Program Statement" -- an
> internal agency guideline -- rather than in "published regulations
> subject to the rigors of the Administrative Procedur[e] Act, including
> public notice and comment."  21 F.3d at 562. But BOP's internal agency
> guideline, which is akin to an "interpretive rule" that "do[es] not
> require notice-and-comment," Shalala v. Guernsey Memorial Hospital,
> 514 U.S. __, __(1995) (slip op., at 11), is still entitled to some
> deference, cf., Martin v. Occupational Safety and Health Review
> Comm'n, 499 U.S. 144, 157 (1991), since it is a "permissible
> construction of the statute." Chevron U.S.A. Inc. v. Natural Resources
> Defense Council, Inc., 467, U.S. 837, 843 (1984).

Reno v. Koray, No. 94-790, 1995 WL 328305, at *7 (U.S. June 5, 1995) (footnote omit

The Secretary's reconciliation of the competing interests in the Medicaid

statute and Hyde Amendment is reasonable.  Because the Secretary's consistent and

contemporaneously expressed construction of the Medicaid statute as amended by the

Amendment is a reasonable one, it is accorded considerable weight under principles

announced in Chevron.

Accordingly, we will defer to the Secretary's interpretation of the Hyde

Amendment, and hold that because the Pennsylvania reporting requirements lack a wai

procedure and therefore may deprive eligible women of the benefits which Congress h

available to them, they are to this extent in conflict with federal law and are inv

See Louisiana Public Service Comm'n. v. F.C.C., 476 U.S. 355, 368-69, 106 S. Ct. 18

1898-99 (1986) (under the Supremacy Clause, a federal agency acting within the scop

22

its congressionally delegated authority has the power to preempt state regulation a

render unenforceable state laws).  Thus, until Pennsylvania, pursuant to state law,

a waiver provision in accordance with the Secretary's directive, the Commonwealth i

enjoined from enforcing its rape and incest reporting requirements.


## III. SECOND PHYSICIAN CERTIFICATION REQUIREMENTS

Like reporting requirements for abortions where pregnancies result from r

incest, certification requirements for abortions necessary to save the life of the

are not expressly addressed in the Hyde Amendment. However, pursuant to the broad

authority to promulgate regulations in administering the Medicaid program, see, e.g

Schweiker, 453 U.S. at 43, 101 S. Ct. at 2640, the Secretary, shortly after the pas

the first Hyde Amendment in 1977, promulgated a regulation concerning abortions whe

mother's life was endangered.  The regulation provides:

> [Federal funding] is available in expenditures for an abortion when a
> physician has found, and certified in writing to the Medicaid agency,
> that on the basis of his professional judgment, the life of the mother
> would be endangered if the fetus were carried to term.

42 C.F.R. § 441.203 (emphasis added).  This regulation has not been altered in subs

since its initial promulgation.

The Secretary construes this regulation to provide if any physician -- in

a woman's attending physician --certifies that the life of the mother would be enda

federal funding is "available."  Consistent with our holding in Roe v. Casey that s

are required by the Medicaid Act to fund all abortion services that are allowed und

Hyde Amendment, the Secretary concludes that a state regulation that attempts, in e

to require a second physician's certification in addition to a certification given

physician" is inconsistent with the regulation.

We must give substantial deference to an agency's construction of its own

regulation.  Martin v. Occupational Safety and Health Review Comm'n, 499 U.S. 144,

23

111 S. Ct. 1171, 1175-76 (1991); <u>Lyng v. Payne</u>, 476 U.S. 926, 939, 106 S. Ct. 2333,

(1986). As the Supreme Court recently announced, courts "must defer to the Secreta

interpretation unless an 'alternative reading is compelled by the regulation's plai

language or by other indications of the Secretary's intent at the time of the regul

promulgation.'" <u>Thomas Jefferson University v. Shalala</u>, __ U.S. __, 114 S. Ct. 238

2386-87 (1994) (quoting <u>Gardebring v. Jenkins</u>, 458 U.S. 415, 430, 108 S. Ct. 1306,

(1988)).[0]

We believe that the Secretary's construction comports with the plain lang

the regulation. The phrase "[Federal funding] is available . . . for an abortion w

<u>physician</u> has found and certified [that the mother's life is endangered]" does not

the class of physicians who have the authority to certify. We believe that this re

of the regulation gives the phrase "a physician" its ordinary and natural meaning.

<u>F.D.I.C. v. Meyer</u>, __ U.S. __, 114 S. Ct. 996, 1001 (1994) ("[W]e construe a statut

term in accordance with its ordinary or natural meaning.").

Further, the history of the physician certification regulation indicates

the Secretary intended this construction at the time of the regulation's promulgati

The 1976 Hyde Amendment provided for federal funding "where the life of the mother

be endangered if the fetus were carried to term." Pub. L. No. 94-439, § 209, 90 St

1418, 1434 (1976). The 1976 Hyde Amendment did not require a physician's certificat

The Secretary issued a notice of proposed rule-making which stated that:

---

[0]In <u>Gardebring</u>, the Supreme Court, while recognizing that the Secretary had not tak
position until that litigation, held that:

> when it is the Secretary's regulation that we are construing, and when
> there is no claim in this Court that the regulation violates any
> constitutional or statutory mandate, we are properly hesitant to
> substitute an alternative reading for the Secretary's unless that
> alternative reading is compelled by the regulation's plain language or
> by other indications of the Secretary's intent at the time of the
> regulation's promulgation.

458 U.S. at 430, 108 S. Ct. at 1314. Thus, we will defer to the Secretary's constr
of her own regulation even if the interpretation is put forth in litigation.

24

> the Department will provide Federal financial participation in the cost of abortions only where the attending physician, on the basis of his or her professional judgment, has certified that the abortion is necessary because the life of the mother would be endangered if the fetus were carried to term.

42 Fed. Reg. 40486 (1977) (emphasis added). The Secretary construed this notice as meaning that "in the absence of fraud, the physician's judgment would be conclusive Fed. Reg. 4574 (1978).

In enacting the 1977 Hyde Amendment, Congress retained the 1976 Hyde Amen language concerning funding for abortions when the mother's life is endangered. Pu No. 95-205, § 101, 91 Stat. 1460 (1977). The Secretary concluded that the failure Congress to question the manner in which the Secretary had previously implemented t exception, and its reenactment without change, should be understood as congressiona approval of the Secretary's interpretation. 43 Fed. Reg. 4574. Thus, notwithstand Congress' silence, the Secretary's 1977 implementing regulations construed the inte Congress to be that certification of life endangerment by a physician should be req 43 Fed. Reg. 4570 (§ 50.304). Accordingly, the Secretary's construction of her regulation, 42 C.F.R. § 441.203, as providing for federal funding when "any physici including a woman's attending physician -- certifies that the life of the mother wo endangered, is consistent with the history of the regulation.

The Secretary's construction is also consistent with other requirements o XIX and its implementing regulations. Section 1396a(a)(17) mandates that states est eligibility requirements that are "consistent with the objectives" of Title XIX. 4 U.S.C. § 1396a(a)(17). In Beal v. Doe, the Supreme Court explained that "Title XIX broadly stated primary objective [is] to enable each state, as far as practicable, furnish medical assistance to individuals whose income and resources are insufficie meet the costs of necessary medical services." Beal v. Doe, 432 U.S. 438, 444, 97 2366, 2371 (1977) (citing 42 U.S.C. §§ 1396, 1396a(a)(10)). A further objective is

25

assure that state Medicaid plans are administered "in a manner consistent with simp

of administration and the best interest of the recipients."  42 U.S.C. § 1396a(a)(1

Hodgson, 614 F.2d at 607.  The Secretary's construction of the implementing regulat

the endangerment certification provision could be said to further these objectives.

1977, in promulgating 42 C.F.R. § 441.203, the Secretary noted:

> The purpose of the certification requirement is not to enable the Department to question physician judgment, but rather to ensure that physician judgment has in fact been exercised.  This is the most efficient manner by which a State agency or a program or project -- or the Department in conducting audits or other enforcement reviews -- may ascertain that the statutory requirements for a claim for Federal financial participation in an abortion have been met.

43 Fed. Reg. 4574.  Thus, we will defer to the Secretary's interpretation of her

regulation that the sufficient condition triggering eligibility for a Medicaid func

abortion is certification by any physician that a woman's life would be endangered

carrying the fetus to term.

In contrast to the Secretary's construction of the federal certification

regulation, Pennsylvania's certification requirements narrow the Secretary's criter

The pertinent part of § 3215(c) of the Pennsylvania Abortion Control Act provides t

state or federal funds will be expended for an abortion, except:

> When abortion is necessary to avert the death of the mother on certification by a physician.  When such physician will perform the abortion or has a pecuniary or proprietary interest in the abortion there shall be a separate certification from a physician who has no such interest.

18 Pa. Cons. Stat. Ann. §3215(c)(1) (emphasis added).  Under the Commonwealth's Med

scheme, even if the attending physician who is to provide the abortion certifies th

procedure is necessary because of life endangerment, there must be yet another

certification.  In effect, the Commonwealth's regulation renders the certification

attending physician irrelevant.  This reading is contrary to the Secretary's regula

which provides that federal funding is available under such circumstances.

Accordingly, because the Pennsylvania second-physician certification requ

for abortions necessary to save the life of the mother conflicts with a Medicaid

implementing regulation as construed by the Secretary, this requirement is invalid.

## CONCLUSION

We hold that the Secretary's construction of the Hyde Amendment is reason

and requires due deference.  Under the Secretary's interpretation, both § 3215(c) a

3215(j) of the Pennsylvania Abortion Control Act are invalid insofar as they (1) fa

allow for a waiver of the rape and incest reporting requirements in accordance wit

HCFA directives and (2) require certification by a second physician in cases where

life of the mother is endangered.  Accordingly, we will affirm the order of the dis

court to the extent that it enjoins the Commonwealth from (1) requiring certificati

second physician, and (2) enforcing its rape and incest reporting requirements unti

adopts, pursuant to state law, a waiver in accordance with the HCFA directive.  In

other respects, these provisions remain enforceable.  We will remand for the entry

order tailored in accordance with this decision.

Elizabeth Blackwell Health Center v. Knoll, No. 94-1954.

NYGAARD, Circuit Judge, dissenting.


Today, the majority holds that, by the simple expedient of writing a lett[er] sub-cabinet-level federal bureaucrat can preempt the statutory enactment of an ele[cted] state legislature. It bases its holding on the principle of deference set forth in Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 [S. Ct.] 2778 (1984), and later cases. Because I believe that what the Secretary would have [us] give her is not deference due, but rather deference run amok, I reach a different r[esult] than the majority, and must dissent.[0]

I.

A.

Federal courts are commanded by Chevron and a host of other cases to give deference to certain legal conclusions of administrative agencies. But deference "[may not] be allowed to slip into a judicial inertia which results in the unauthorized assump[tion by] an agency of major policy decisions properly made by Congress." BATF v. FLRA, 464 [U.S.] 89, 97, 104 S. Ct. 439, 444 (1983); accord EEOC v. Arabian Am. Oil Co., 499 U.S. 24[4,] ____, 111 S. Ct. 1227, 1237 (1991) (Scalia, J., concurring) ("deference is not abdication"); St. Luke's Hosp. v. Secretary of Health & Human Servs., 810 F.2d 325, [331] (1st Cir. 1987). (quoting BATF). It is therefore vital that we carefully consider e[ach] case to determine whether deference is warranted, and if so, how much to accord. A[nything] less has the potential to be judicial abdication rather than judicial review. See [ ]

_____

[0]My reasons for doing so are, regrettably for the readers who must digest them whol[e,] somewhat lengthy and involved. As Justice Scalia once said, "Administrative law is [not] for sissies--so you should lean back, clutch the sides of your chairs, and steel yourselves. . . ." Hon. Antonin Scalia, Judicial Deference to Administrative Interpretations of Law, 1989 Duke L.J. 511, 511.

Craft Clothing Co. v. NLRB, 660 F.2d 910, 914-16 (3d Cir. 1981); West v. Bowen, 879

1122, 1134 (3d Cir. 1989) (Mansmann, J., concurring and dissenting); Hon. Joseph W.

Jr., A Judicial Perspective On Deference to Administrative Agencies: Some Grenades

the Trenches, 2 Admin. L.J. 301, 307 (1988).

## B.

> The full language of the Hyde Amendment provides as follows:
> None of the funds appropriated under this Act shall be expended for
> any abortion except when it is made known to the Federal entity or
> official to which funds are appropriated under this Act that such
> procedure is necessary to save the life of the mother or that the
> pregnancy is the result of an act of rape or incest.

Pub. L. No. 103-112, § 509, 107 Stat. 1082, 1113 (1993).  As written, the statutory

language neither requires nor forbids state reporting requirements in cases of rape

incest, and the majority quite correctly rejects the position of the providers and

district court that such requirements are per se in conflict with the Hyde Amendmen

(majority typescript at 20-24). The majority then goes on to hold that we must defe

Chevron to the interpretation of the Director of the Medicaid Bureau that reporting

certification requirements are invalid in the absence of a waiver provision.  Id. a

31.  I believe this to be incorrect.

## C.

In Chevron, the Environmental Protection Agency promulgated a legislative

to define the statutory term "stationary source" as an entire manufacturing plant.

Clean Air Act, while requiring permits for new or modified stationary sources, gave

indication of how such a source should be defined.  In approaching the standard for

judicial review of the agency's choice, the Supreme Court employed a bifurcated ana

> First, always, is the question of whether Congress has directly spoken
> to the precise question at issue.  If the intent of Congress is clear,
> that is the end of the matter, for the court, as well as the agency,
> must give effect to the unambiguously expressed intent of Congress.
> If, however, the court determines Congress has not directly addressed
> the precise question at issue, the court does not simply impose its
> own construction of the statute, as would be necessary in the absence

29

> of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

467 U.S. at 842-43, 104 S. Ct. at 2781-82 (footnotes omitted).

To recapitulate, "the appropriate level of deference due an agency's construction of a statute that it administers depends on the clarity of the statute Pennsylvania v. United States Dep't of Health & Human Servs., 928 F.2d 1378, 1383-8 Cir. 1991). In Chevron step one, we examine the statutory language to determine wh Congress has directly spoken to the issue; if it has, we do not even proceed to ste Pennsylvania Medical Soc'y v. Snider, 29 F.3d 886, 902 (3d Cir. 1994). Only if Cor has not spoken, may we apply step two of the Chevron analysis. And then we are lin reviewing whether the agency's construction of the statute is "permissible." Befor reviewing court can even reach step two, however, it must find that Congress explic implicitly delegated to the agency the authority to construe the statutory provisio issue. See Adams Fruit Co. v. Barrett, 494 U.S. 638, 649, 110 S. Ct. 1384, 1390 (1 ("[A] precondition to deference under Chevron is a congressional delegation of administrative authority."). I simply do not believe there was a delegation here. infra Part IV.

## II.

### A.

The majority, relying on Bailey v. Sullivan, 885 F.2d 52, 62 (3d Cir. 198 American Mining Congress v. Mine Safety & Health Admin., 995 F.2d 1106, 1112 (D.C. 1993), concludes that the letters constitute validly promulgated interpretive rules than legislative rules (typescript at 28).[0] I agree reluctantly that, under bindin

---

[0]This conclusion is vital to the majority's holding. Under the Administrative Proc Act, rules may be either legislative or nonlegislative. A legislative rule must be promulgated according to the notice and comment procedures of 5 U.S.C. § 553, which Secretary did not do in this case. See, e.g., Beazer E., Inc. v. United States Env Protection Agency, 963 F.2d 603, 606 (3d Cir. 1992); Texaco, Inc. v. Federal Power

30

circuit precedent, the letters must be treated as interpretive rules.  Were I unfet

by precedent, however, I would conclude that the letters are "spurious rules," enti

no weight whatsoever, as I shall explain shortly.

In Bailey, we opined that "[i]f the rule in question merely clarifies or

explains existing law or regulations, it will be deemed interpretive."  885 F.2d at

The majority seems to imply that, because the two letters clarify and explain the a

existing Medicaid Act and Hyde Amendment, they are interpretive.  But this reasonin

proves too much.  Indeed, it is difficult to conceive of any nonprocedural regulati

does not in some way explain or clarify an existing federal statute.

The reported decisions have been nearly unanimous in adopting a more rest

definition of what type rule merely clarifies or explains existing law.  If the pos

the agency takes in its rule flows directly from the statutory language itself, i.e

court would reach the same construction of the statute even in the absence of the

regulation, the rule is interpretive.  On the other hand, if the rule exercises a

congressional delegation of power to make binding rules that create rights, assign

or impose obligations, it is legislative.  This distinction was aptly explained in

Navigation Co. v. Pomeroy, 34 F.3d 1255 (3d Cir. 1994), where we stated, relying in

on FLRA v. Dep't of the Navy, 966 F.2d 747, 762 n.14 (3d Cir. 1992) (in banc):

> The critical difference between legislative and interpretive rules is
> that the former have the force and effect of law while the latter do
> not.  Stated differently, legislative rules have substantive legal
> effect, while interpretive rules typically involve construction or
> clarification of a statute or regulation.  If a rule creates rights,
> assigns duties, or imposes obligations, the basic tenor of which is
> not already outlined in the law itself, then it is substantive
> [legislative].  Put yet another way, "what distinguishes interpretive
> from legislative rules is the legal base upon which the rule rests.
> If the rule is based on specific statutory provisions, and its
> validity stands or falls on the correctness of the agency's
> interpretation of those provisions, it is an interpretive rule.  If,

412 F.2d 740, 742 (3d Cir. 1969).  Indeed, a legislative rule which is not promulga
accordance with the requirements of the APA is not entitled to have the force of la
See, e.g., Chrysler Corp. v. Brown, 441 U.S. 281, 302-03, 99 S. Ct. 1705, 1718 (197

31

> however, the rule is based on an agency's power to exercise its judgment as to how best to implement a general statutory mandate, the rule is likely a legislative one." United Technologies Corp. v. EPA, 821 F.2d 714, 719-20 (D.C. Cir. 1987).

34 F.3d at 1264 (some citations and internal quotation marks omitted).[0] Thus, to t

extent the majority purports to hold that any rule that explains or clarifies an e

statute or regulation is interpretive notwithstanding the fact that the duties impo

thereby do not flow directly from the statutory language, its holding contravenes e

decisions of this court, in violation of Third Circuit Internal Operating Procedure

American Mining is nothing more than a refinement of the law discussed ab

that is to say, for a rule to be legislative and have the force of law, Congress mu

delegated legislative power to the agency and the agency must have intended to exer

that power in promulgating its rule. 995 F.2d at 1109. Under this test, to determi

whether a rule is legislative or interpretive, a reviewing court uses four factors,

one of which indicates that the rule is legislative. The first, whether in the abse

the rule the agency could not succeed in an enforcement action, id. at 1112, simply

restates the law discussed above. The others, which include whether the agency has

published its rule in the Code of Federal Regulations; whether the agency has expli

invoked its legislative authority; or whether the rule amends a prior legislative r

id., are additional factors indicating that a rule is legislative.

B.

Under the American Mining test, the two letters at issue here are distinc

legislative in character. Looking only at the plain language of the statute, there

---

[0] Accord Shalala v. Guernsey Mem. Hosp., ___ U.S. ____, ____, 115 S. Ct. 1232, 1239 (a rule that effects a change in the law is legislative and must comply with APA rulemaking requirements); Beazer E., 963 F.2d at 606 (interpretive rule only remind parties of existing duties); Texaco, 412 F.2d at 744 (general statements of policy no rights or obligations). This distinction is equally true in the case of federal cooperative programs, such as Medicaid. See Ohio Dep't of Human Servs. v. United St Dep't of Health & Human Servs., 862 F.2d 1228, 1229-30 (6th Cir. 1988) (HCFA Medica not interpretive); Cabais v. Egger, 690 F.2d 234, 238-289 (D.C. Cir. 1982) (federal regulation of state-administered program not interpretive).

32

simply no way that the Hyde Amendment itself can be construed to require or forbid

reporting and certification requirements, with or without a waiver provision. Even

majority recognizes as much, because it relies entirely on Chevron deference to rea

holding that Pennsylvania law is preempted. See majority typescript at 20-31. In t

absence of the two letters, there would be no plausible argument that Pennsylvania'

reporting and certification requirements are invalid. Accordingly, the letters fai

American Mining and Dia Navigation tests; they are not interpretive rules.

Because the Secretary failed to follow the § 553 notice and comment proce

however, her two letters, while legislative in character, have no force of law what

See Chrysler Corp. v. Brown, 441 U.S. at 302-03, 99 S. Ct. at 1718; Alaska v. Unite

States Dep't of Transp., 868 F.2d 441, 445 (D.C. Cir. 1989); Charles H. Koch, Jr. &

F. Wright, Jr., Administrative Law and Practice § 3.13, at 49 (Supp. 1995). Indeed,

Professor Anthony points out, they are not true legislative rules at all, but rathe

examples of invalid "spurious rules;" that is, rules that go beyond mere interpreta

existing law and purport to have binding effect, yet were not submitted to notice a

comment rulemaking. Robert A. Anthony, "Interpretive" Rules, "Legislative" Rules an

"Spurious" Rules: Lifting the Smog, 8 Admin. L.J. 1, 9-10, 14 (1994). Discussing A

Mining, Professor Anthony argues that any rule meeting any of American Mining's fou

criteria without being subjected to notice and comment is a spurious rule and has n

validity. Id. at 15-22. I agree.

Nevertheless, precedent constrains us to treat these two letters as inter

rules. In Daughters of Miriam Ctr. v. Mathews, 590 F.2d 1250, 1255-56 & n.9 (3d Ci

1978), we stated that, because the agency's rules were not promulgated in accordanc

§ 553 of the Administrative Procedure Act, 5 U.S.C. § 553, "they perforce must be

considered interpretive rules." We also relied on the agency's characterization of

rules as interpretive. Id. Two years later, we followed the Mathews approach, "ta

the agency at its word" that its rule was interpretive. Cerro Metal Prods. v. Mars

620 F.2d 964, 981-82 (3d Cir. 1980).[°]  Thus, and although I strenuously disagree wi

result, under Third Circuit Internal Operating Procedure 9.1 we must treat the age

two letters as interpretive rules, despite their spurious character.  See United St

Monaco, 23 F.3d 793, 803 (3d Cir. 1994).[°]

C.

The fact that we are required to treat the two letters as interpretive ru

does not excuse the agency from its failure to follow the notice and comment rulema

procedure, however. Where, as here, a regulatory agency intends to bind the public

states, it is incumbent upon it to promulgate a valid legislative rule.  As we said

Navigation, the purpose of the § 553 notice and comment procedure is to insure publ

participation by and fairness to affected parties when lawmaking authority has been

delegated to unelected, unrepresentative regulatory agencies.  34 F.3d at 1255 (quo

Batterton v. Marshall, 648 F.2d 694, 703 (D.C. Cir. 1980)).  It "avoid[s] the inher

arbitrary nature of unpublished determinations." Morton v. Ruiz, 415 U.S. 199, 232,

Ct. 1055, 1073 (1974).  Notice and comment also serves the salutary purpose of forc

agency to educate itself on the facts, issues and policy options available before i

binding regulations.  FLRA, 966 F.2d at 763 (quoting Texaco, 412 F.2d at 744); Batt

---

[°]See also Ohio, 862 F.2d at 1234-35 (HCFA Medicaid rule was legislative in characte
was treated for deference purposes as interpretive).
[°]There is some evidence that the law of the circuit has evolved over the fifteen ye
since Cerro and Mathews.  In Limerick Ecology Action, Inc. v. United States Nuclear
Regulatory Comm'n, 869 F.2d 719 (3d Cir. 1989), we stated that:

> The agency's label of an agency action, although one factor to be
> considered, does not control whether the action is in fact a
> [legislative] rulemaking.  Instead, it is the substance of what the
> agency has purported to do and has done which is decisive.

Id. at 734 (citation to Cerro and other cases omitted).  It is apparent from this l
that the Limerick court, like the courts in Dia Navigation and American Mining, too
functional approach to distinguishing legislative from interpretive rules. Neverthe
there is no evidence in any of our cases, including FLRA (which was heard in banc),
the Cerro-Mathews approach has been overruled.

34

648 F.2d at 703-04 (same); <u>accord</u> <u>Marshall v. Western Union Tel. Co.</u>, 621 F.2d 1246

(3d Cir. 1980); Robert A. Anthony, <u>"Well, You Want the Permit, Don't You?" Agency</u>

<u>to Make Nonlegislative Documents Bind the Public</u>, 44 Admin L. Rev. 31, 32 (1992)

[hereinafter Anthony, <u>Agency Efforts</u>].  I can say it no better than Professor Anth

states:

> Values served by the legislative rulemaking process are large ones.  Fairness is furthered by giving notice to those who are to be bound, both when the proposed rule is about to be considered and when the final rule is definitively published.  The accuracy and thoroughness of an agency's actions are enhanced by the requirement that it invite and consider the comments of all the world, including those of directly affected persons who are able, often uniquely, to supply pertinent information and analysis.  The acceptability and therefore the effectiveness of a final rule are elevated by the openness of the procedures through which it has been deliberated and by the public's sense of useful participation in a process that affects them.  Its legitimacy rests upon all of these considerations, as well as upon the foundational fact that the agency has observed the procedures laid down by Congress for establishing rules with the binding force of law.  The agency's accountability for its rules is deepened by the court-made requirement of a reasoned explanation based upon a substantial rulemaking record.
>
> Beyond all of this, the APA rulemaking requirements impose a salutary discipline. That discipline deters casual and sloppy action, and thereby forestalls the confusion and needless litigation that can result from such action.  And that discipline reduces tendencies toward over-regulation or bureaucratic overreaching, and discourages low-profile attempts to create practically-binding norms that Congress or the Administration would not have approved.

Robert A. Anthony, <u>Interpretive Rules, Policy Statements, Guidances, Manuals, and t</u>

<u>Like--Should Federal Agencies Use Them to Bind the Public?</u>, 41 Duke L.J. 1311, 1373

(1992), <u>also published as</u> Administrative Conference of the United States, <u>Recommend</u>

<u>and Reports</u>, <u>Report for Recommendation 92-2</u>, 1992 ACUS 71, 136-37.[0]

---

[0]The Administrative Conference of the United States adopted Professor Anthony's recommendation.  1992 ACUS 5, 41 Duke L.J. at 1384; <u>see</u> 1 C.F.R. 305.92-2.  Recomme 92-2 provides that "[a]gencies should not issue statements of general applicability are intended to impose binding substantive standards or obligations upon affected p without using legislative rulemaking procedures (normally including notice-and-comm

In <u>State of New Jersey v. Department of Health & Human Servs.</u>, 670 F.2d 1

1281 (3d Cir. 1981), we explained:

> The APA notice and comment procedures exist for good reason: to
> ensure that unelected administrators, who are not directly accountable
> to the populace, are forced to justify their quasi-legislative
> rulemaking before an informed and skeptical public.  When these
> procedures are not followed in situations where they are in fact
> applicable, a court promotes neither the agency's ultimate mission nor
> respect for the law by ignoring the agency's indiscretion or condoning
> the agency's shortcut.

There is indeed a great danger in giving <u>Chevron</u> deference (and often, legislative

to rules promulgated without the benefit of notice and comment rulemaking.  First o

it encourages agencies to flout the Administrative Procedure Act and issue binding

regulations in informal formats.  <u>See</u> <u>Community Nutrition Inst. v. Young</u>, 818 F.2d

953 (D.C. Cir. 1987) (Starr, J., concurring and dissenting) (agencies may yield to

temptation and issue rules with legislative effect in interpretive formats to avoid

scrutiny).  After all, once a reviewing court defers to the agency and upholds a ru

the majority does here, it becomes law without the bother of the agency taking true

legislative action.  Worse, it results in private parties (and, in this case, the

Commonwealth of Pennsylvania) being bound by "a proposition they had no opportunity

shape and will have no meaningful opportunity to challenge when it is applied to th

<u>National Family Planning & Reprod. Health Ass'n, Inc. v. Sullivan</u>, 979 F.2d 227, 24

Cir. 1992) (citing Anthony, <u>Agency Efforts</u>, <u>supra</u>, at 38; quoting Robert A. Anthony

<u>Agency Interpretations Should Bind Citizens and the Courts</u>, 7 Yale J. on Reg. 1, 58

(1990)); <u>see also</u> 1 Kenneth C. Davis & Richard J. Pierce, <u>Administrative Law Treati</u>

3.5, at 119-20 (1994) (<u>Chevron</u> deference inappropriate for nonlegislative rules).

such a result both politically undemocratic and jurisprudentially odious.

### III.

The majority, while treating the two letters as interpretive rules, never

gives them full deference under <u>Chevron</u>, a case that arose in the context of a legi

rule and quite different jurisprudential concerns.  I believe that this, too, is

incorrect.

A.

Before Chevron, the amount of consideration to be given interpretive rule

well-settled.  The classic statement from the Supreme Court was given in Skidmore v

& Co., 323 U.S. 134, 140, 65 S. Ct. 161, 164 (1944):

> We consider that the rulings, interpretations and opinions of the
> Administrator under this Act, while not controlling upon the courts by
> reason of their authority, do constitute a body of experience and
> informed judgment to which courts and litigants may properly resort
> for guidance.  The weight of such a judgment in a particular case will
> depend upon the thoroughness evident in its consideration, the
> validity of its reasoning, its consistency with earlier and later
> pronouncements, and all those factors which give it power to persuade,
> if lacking power to control.

This approach was reaffirmed three decades later in General Elec. Co v. Gilbert, 42

125, 141-42, 97 S. Ct. 401, 411 (1976), where the Court analyzed an EEOC guideline

interpretive rule under the Skidmore doctrine.[0]

Chevron, of course, was a watershed decision in the area of judicial defe

to regulatory agencies. Significantly, however, Chevron involved a properly promulg

legislative rule.  That case simply did not deal with the level of consideration a

should give to an interpretive rule, and did not overrule Skidmore.

Indeed, in the years following Chevron, the Supreme Court has reaffirmed

Skidmore consideration is the appropriate standard of review for interpretive rules

Martin v. Occupational Safety & Health Review Comm'n, 499 U.S. 144, ____, 111 S. Ct

1179 (1991), the Court, citing Skidmore, opined that interpretive rules are not "en

to the same deference as norms that derive from the exercise of the Secretary's del

lawmaking powers[.]"  And in EEOC, the Supreme Court again relied upon Skidmore and

---

[0] Accord Batterton v. Francis, 432 U.S. 416, 424 & n.9, 97 S. Ct. 2399, 2405-06 & n.
(1977); Morton, 415 U.S. at 237, 94 S. Ct. at 1075; State of New Jersey, 670 F.2d a
Cerro, 620 F.2d at 980-82; Baker v. Otis Elevator Co., 609 F.2d 686, 692 (3d Cir. 1
Mathews, 590 F.2d at 1258.

Gilbert, not Chevron, to determine how much weight to give an interpretive rule. 4

at ____, 111 S. Ct. at 1235;[0] accord Public Citizen v. United States Dep't of Justi

U.S. 440, 463 n. 12, 109 S. Ct. 2558, 2571-72 n.12 (1989) (interpretive rule entitl

less weight, relying on Gilbert). It is therefore manifest that Skidmore and Gilbe

survived Chevron.

Recently, in dicta, four panels have questioned whether Skidmore or Gilbe

overruled by Chevron. See E.I. duPont de Nemours & Co. v. Commissioner, 41 F.3d 13

36 n.23 (3d Cir. 1994); Sekula v. Federal Deposit Ins. Corp., 39 F.3d 448, 453-54 n

Cir. 1994); Reich v. Local 30, Int'l Bhd. of Teamsters, 6 F.3d 978, 987 n.14 (3d Ci

1993); International Raw Materials, Ltd. v. Stauffer Chemical Co., 978 F.2d 1318, 1

(3d Cir. 1992), cert. denied, ___ U.S. ____, 113 S. Ct. 1588 (1993). None of these

opinions discussed the effect of Martin or EEOC.

In fact, in several cases decided after Chevron, we have not given Chevro

deference to interpretive rules. In Armstead v. United States Dep't of Housing & U

Dev., 815 F.2d 278, 282 (3d Cir. 1987), we stated that interpretive rules are not b

on the agency or the court. Likewise, in American Ambulance Serv., Inc. v. Sulliva

F.2d 901, 908 (3d Cir. 1990), we opined that "[i]nterpretive rules are entitled to

weight on judicial review than their inherent persuasiveness commands" (citing Batt

v. Marshall, 648 F.2d at 705). Indeed, in FLRA, we applied this standard of review

interpretive rule announced in letter form and refused to give it controlling weigh

F.2d at 762-64 & n.14. I think the above line of cases makes it clear that neither

Supreme Court nor this court has recognized any erosion of Skidmore or Gilbert.

In Snider, we refused to apply Chevron, holding that the statute was unam

under step one of the test and opining that "[c]omplexity alone is not enough to tr

---

[0]Justice Scalia concurred, opining that the interpretive rule was entitled to Chevr
deference and that Gilbert was "an anachronism[.]" Id. at ____, 111 S. Ct. at 1236
is thus clear that the majority held that Chevron was not applicable.

38

Chevron." 29 F.3d at 902. We did, however, in evaluating the Secretary's position

to one of the Skidmore factors to determine how much consideration to give to her

interpretation. Because the Secretary had changed her position on the issue, we ref

give her interpretation "any deference," id., although it is perhaps more accurate

that we gave it consideration but not controlling weight.[0] In a similar vein is Ma

Secretary of Health and Human Servs., 903 F.2d 953, 958-59 (3d Cir. 1990), in which

citing Skidmore and Gilbert, we rejected an agency interpretation that contradicted

earlier position.

One of our cases contains some language that superficially seems to suppo

majority's position. In Kean v. Heckler, 799 F.2d 895, 902 (3d Cir. 1986), we purp

to defer under Chevron to an agency interpretation. Yet, we went on to consider fa

normally relevant only in a Skidmore-Gilbert analysis, including the Secretary's al

change in position, the fact that her interpretation was contemporaneous with the

enactment of the statute, and the expertise of her agency. Id. at 902-03. Nowhere

even intimate that Chevron had overruled Skidmore or Gilbert. In any event, even i

did hold that Chevron deference is required for agency interpretations, I conclude

was implicitly overruled by the Supreme Court in Martin and EEOC.

Many other courts agree that Skidmore-Gilbert is the appropriate standard

review for interpretive rules. In Atchinson, T. & S.F. Ry. v. Peña, 44 F.3d 437 (7

1994) (en banc), cert. granted, No. 94-1592, 63 U.S.L.W. 3883, 3889, 1995 U.S. LEXI

1995 WL 156485, (U.S. June 19, 1995), the court, while making clear that an interpr

rule is entitled to some deference, refused to "rubber stamp" the agency's action a

rejected the contention that full Chevron deference applies to such rules. Id. at

Instead, it applied the Skidmore factors and held that the interpretation deserved

---

[0] We give consideration to the agency's interpretation (which many courts refer to a
deference), then we decide how much weight the interpretation should receive. To s
we give it "no deference" implies that we do not even consider it, which is not the

39

deference.[0] Significantly, the court also held that any deference (consideration) d

interpretation must arise from "the agency's diligent study of the statute and the

underlying activity it seeks to regulate."  Id. at 443.

Similarly, in Doe v. Reivitz, 830 F.2d 1441 (7th Cir. 1987), a federal ag

sent a letter to state welfare authorities restricting the eligibility of certain b

from dependents of illegal aliens.  The Secretary argued that his regulation was en

to Chevron deference, but the court disagreed, opining:

> The documents at issue in this case are interpretive rather than
> legislative in nature, and under longstanding principles, agency
> interpretations are not entitled to the same degree of deference
> commanded by the high-powered regulations in Chevron.  The Court in
> Chevron did not purport to alter the scope of review traditionally
> accorded interpretive documents.

Id. at 1446 (citation omitted).  It continued:

> HHS did not engage in notice-and-comment rule making in issuing its
> AFDC-UP eligibility policy.  The agency cannot now contend that courts
> must accord to this policy the deference due a legislative rule when
> the agency has not followed the normal procedures associated with
> force-of-law rule making.

Id.  The court then went on to analyze the interpretive rule under the Skidmore doc

refusing to give controlling weight to the rule on the grounds that the interpretat

not contemporaneous with the passage of the statute and the agency's reasoning was

defective.  Id. at 1447-51.[0]

---

[0]Again, it would have been more accurate if the court had said that the interpretat
would not be given controlling weight rather than it would be given no deference.
[0]The overwhelming majority of the other federal courts of appeals has followed esse
the same reasoning.  See Kelley v. E.I. duPont de Nemours & Co., 17 F.3d 836, 841-4
Cir. 1994) (policy statements and interpretive rulings not entitled to Chevron defe
but are analyzed under Skidmore factors); Motor Vehicle Mfrs. Ass'n v. New York Sta
Dep't of Envtl. Conservation, 17 F.3d 521, 534-35 (2d Cir. 1994) (no Chevron defere
EPA advisory circular); Travelstead v. Derwinski, 978 F.2d 1244, 1250 (Fed. Cir. 19
(interpretive rules receive only Skidmore consideration); Dalheim v. KDFW-TV, 918 F
1220, 1228 (5th Cir. 1990) (interpretive rules not binding, relying on Skidmore); C
862 F.2d at 1235 (6th Cir.) (according only Skidmore consideration to interpretive
thoroughness evident in agency reasoning was "most unimpressive"); Paxton v. Secret
Health & Human Servs., 856 F.2d 1352, 1356-57 (9th Cir. 1988) (interpretive rule no
Chevron deference); St. Luke's Hosp., 810 F.2d at 331-32 (1st Cir.) (interpretation
even ambiguous statute given only Skidmore consideration); Capitano v. Secretary of
& Human Servs., 732 F.2d 1066, 1075-76 (2d Cir. 1984) (rule treated as interpretive

Indeed, in the D.C. Circuit, the court of appeals has issued a number of

opinions to the effect that interpretive rules do not receive full <u>Chevron</u> deferenc

at most, <u>Skidmore</u> consideration. As one panel said, "[a] binding policy is an oxym

<u>Vietnam Veterans of Am. v. Secretary of the Navy</u>, 843 F.2d 528, 537 (D.C. Cir. 1988

<u>Samaritan Health Serv. v. Bowen</u>, 811 F.2d 1524 (D.C. Cir. 1987), the court stated:

> While substantive rules are typically characterized as having the
>
> force and effect of law, interpretive rules enjoy a lesser deference--
>
> doubtless in part because of the absence of public opportunity to
>
> comment. . . . Any deference that an interpretive rule may claim
>
> depends on "the thoroughness evident in its consideration, the
>
> validity of its reasoning, its consistency with earlier and later
>
> pronouncements, and all those factors which give it power to persuade,
>
> if lacking power to control."

<u>Id.</u> at 1529 (quoting <u>Skidmore</u>) (some citations and internal quotation marks omitted

<u>accord</u> <u>American Fed'n of Labor v. Donovan</u>, 757 F.2d 330, 341-42 (D.C. Cir. 1985)

(interpretive rule, while receiving "some" deference, does not receive full deferen

<u>Batterton</u>, 648 F.2d at 702 (nonlegislative rules carry no more weight than their in

persuasiveness commands).

The majority, however, relies on <u>Health Ins. Ass'n of Am., Inc. v. Shalal</u>

F.3d 412, 424 & n.8 (D.C. Cir. 1994), <u>cert. denied</u>, ___ U.S. ____, 115 S. Ct. 1095

for the proposition that <u>Chevron</u> "deference is appropriate even though the Secretar

interpretation is not contained in a 'legislative rule.'" <u>See</u> majority typescript a

<u>Skidmore</u> analysis); <u>Frank Diehl Farms v. Secretary of Labor</u>, 696 F.2d 1325, 1329-30
Cir. 1983) (interpretive rules get less deference than legislative rules, citing
<u>Skidmore</u>).

The majority also relies on <u>Hicks v. Cantrell</u>, 803 F.2d 789, 793-94 (4th Cir. 1986
There, and with very little analysis, the court held that <u>Chevron</u> deference was owe
agency interpretation. Because of <u>Hicks</u>' minimal reasoning and its conflict with t
overwhelming majority of courts that have considered the same issue (including the
Court), I simply would not follow it.

There, because the parties agreed that <u>Chevron</u> applied, the court did not reach the

but stated in dictum that it had "often applied <u>Chevron</u> deference to interpretive r

without comment."  <u>Id.</u> at 424 n.8 (citing two cases).

One of the cases the <u>Health Insurance</u> court relied on is <u>Wagner Seed Co.</u>

<u>Bush</u>, 946 F.2d 918 (D.C. Cir. 1991), <u>cert. denied</u>, 503 U.S. 970, 112 S. Ct. 1584 (1

in which the EPA issued a rule in a decision letter rather than by notice and comme

rulemaking.  <u>Id.</u> at 921.  The court stated that "it is simply not the law of this c

that an interpretive regulation does not receive the <u>Chevron</u> deference accorded a

legislative regulation."  <u>Id.</u> at 922.  Nowhere in its opinion, however, did it addr

prior contrary holdings, discussed above, and the cases it relied upon are opaque a

concerning deference to interpretive rules.  And notably, although <u>Wagner Seed</u> was

shortly after the Supreme Court's decisions in <u>Martin</u> and <u>EEOC</u>, the court addressed

neither of these cases in its opinion.

The other case cited in <u>Health Insurance</u> is <u>General Motors Corp. v. Rucke</u>

742 F.2d 1561, 1566-67 (D.C. Cir. 1984), <u>cert. denied</u>, 471 U.S. 1074, 105 S. Ct. 21

(1985).  In that case, which was decided only three months after <u>Chevron</u>, the court

apply <u>Chevron</u> deference to an interpretive rule, but again, without analyzing its p

holdings to determine whether they survived <u>Chevron</u>.  In any event, <u>General Motors</u>

decided before the Supreme Court's decisions in <u>Martin</u> and <u>EEOC</u> and cannot survive

At best, then, these cases indicate an intra-circuit split of authority i

D.C. Circuit on the question of deference to interpretive rules.  Given the weight

authority against granting <u>Chevron</u> deference to interpretive rules, I am not persua

<u>Health Insurance</u> and the two cases it cites.

As final support for its holding that interpretive rules are entitled to

deference, the majority relies on the Supreme Court's recent decision in <u>Reno v. Ko</u>

___ U.S. ____, 115 S. Ct. 2021 (1995), <u>rev'g</u> <u>Koray v. Sizer</u>, 21 F.3d 558 (3d Cir. 1

42

See majority typescript at 29-30. Careful examination of that case reveals it to b

inapposite.

In Koray, we held that time served by a defendant in a halfway house may

constitute time spent in official detention, entitling him to credit against his se

under 18 U.S.C. §3585(b). Id. at 567. We declined to grant full Chevron deference

Bureau of Prisons internal agency guidelines. Id. at 562. We did, however, citing

Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 42, 103 S. Ct.

2866 (1983), accord "some deference" to the extent the agency "engaged in the neces

'reasoned' analysis of this issue." Id. Although that inquiry bears some similarit

Skidmore analysis, we did not cite or apply Skidmore, Gilbert, Martin, or EEOC in K

Then, based entirely on the plain language of the statute, we held that the words

"official detention" did not mean, as the government argued, "official detention by

Attorney General or the Bureau of Prisons." Id. at 563-64.

Our analysis in Koray was entirely within Chevron step one: whether Congr

plainly spoken to the issue, and the "deference" (really consideration) we gave the

interpretation was likewise an aid to our step one analysis. See Michael Herz, Def

Running Riot: Separating Interpretation and Lawmaking Under Chevron, 6 Admin. L.J.

208-09 (1992) (Skidmore analysis is a part of Chevron step one). We simply never r

Chevron step two.

Neither did the Supreme Court. In reversing our decision, the Court exam

number of related statutes using the phrase "official detention." 115 S. Ct. at 20

Based entirely on its construction of § 3585(b) in pari materia with the other stat

and on the legislative history, the Supreme Court concluded that "the Bureau's

interpretation is the most natural and reasonable reading of § 3585(b)'s 'official

detention' language." Id. at 2027.

The Supreme Court's decision in Koray is a classic Chevron step one holdi

Court construed the statute in accordance with the clear intent of Congress, and co

43

that our construction was erroneous.  Because the statute was not ambiguous, the Co[urt]
simply did not reach step two of the Chevron analysis.  The Court stated only that [the]
agency's interpretive rule "is still entitled to some deference, since it is a perm[issible]
construction of the statute[,]"[0] id. (emphasis added) (citations and internal quota[tion]
marks omitted), opining that "it would be too much to say that the statute cannot b[ear the]
interpretation adopted by the Bureau."  Id. (citation and internal quotation marks []
omitted).[0]

It is important not to read too much into this language, however.  Both c[ourts]
agreed that the agency's interpretation was entitled to "some deference."  115 S. C[t. at]
2027; 21 F.3d at 562.  I believe all the Supreme Court told us in Koray was that, b[ecause]
the agency's construction of the statute best reflected the clear intent of Congres[s, we]
should have give it controlling weight.  Koray did not hold that the statute was am[biguous]
or that there was a delegation of authority to the agency to fill a gap in the stat[utory]
scheme.  Because of that, as discussed earlier, Koray simply is not a step two case[.]

---

[0]This language is taken from Chevron, 467 U.S. at 843, 104 S. Ct. at 2782, where th[e Court]
sets forth step two of the Chevron test.  Because Koray is a step one case, I concl[ude]
that the use of that quotation amounts to, at most, an "imprecision in the Court's [own]
language," not an implicit part of its holding.  See Pope v. East Brunswick Bd. of [Educ.,]
12 F.3d 1244, 1250 (3d Cir. 1993).

[0]The Court quoted Sullivan v. Everhart, 494 U.S. 83, 91-92, 110 S. Ct. 960, 965-66 [(1990).]
There, recipients of federal benefits challenged the Secretary's "netting" regulati[ons,]
which were promulgated as legislative rules.  The recipients proffered a plausible [statutory]
construction but the court held--deferring under step two of Chevron--that at most, [the]
recipients proved that the statute could bear their construction, but not that it c[ould]
not bear the Secretary's construction.  That, according to the Court, was insuffici[ent.]
While the Court's reasoning was certainly applicable to a step two case, Koray and [this]
case arise under Chevron step one, which has a less-deferential standard.

[0]Compare Babbitt v. Sweet Home Chapter of Communities for a Greater Oregon, No. 94-[859, 63]
U.S.L.W. 4665, 115 S. Ct. ____, 1885 U.S. LEXIS 4463, 1995 WL 382088 (U.S. June 29, [1995).]
There, the agency promulgated a proper legislative rule giving further meaning to t[he]
statutory term "take" under the Endangered Species Act, 16 U.S.C. § 1531 et seq.  W[hile]
the Supreme Court engaged in an analysis of the text and legislative history of the [statute,]
in the final analysis, it decided that "Congress did not unambiguously manifest its[]
intent" to contradict the government's view of the statute.  The Court accordingly []
deferred to the "reasonable" interpretation of the agency.  63 U.S.L.W. at 4670.  Sw[eet]
Home, in contrast to Koray, clearly implicated Chevron step two.

In addition, the Koray Court did not overrule, limit or even criticize it[s] earlier decisions in Skidmore, Morton, Gilbert, Martin or EEOC. I therefore disagr[ee] the majority's implicit assertion that the Supreme Court in Koray overruled all of [these] cases sub silentio. Had the Supreme Court intended to make such a sweeping change [to] administrative law jurisprudence, it would have done so explicitly. I conclude tha[t the] Supreme Court's opinion in Koray cannot support such a conclusion. I therefore con[clude] that Skidmore and Gilbert, not Chevron step two, provide the appropriate standard o[f] review for interpretive rules.

B.

Under the standard enunciated in Skidmore, these two letters, to which we [are] asked to defer, do not fare well. In Skidmore, the Supreme Court focused on "the thoroughness evident in [the agency's] consideration, the validity of its reasoning[, its] consistency with earlier and later pronouncements, and all those factors which give [it] power to persuade, if lacking power to control." 323 U.S. at 140, 65 S. Ct. at 164[. It] is also appropriate to consider whether the agency's interpretation is contemporane[ous] with the passage of the statute and has been in long use. Davis v. United States, [495] U.S. 472, 484, 110 S. Ct. 2014, 2022 (1990). Finally, we may examine whether the a[gency] has developed expertise over the subject matter at issue. See Pension Benefit Guar. [Corp.] v. LTV Corp., 496 U.S. 633, 651-52, 110 S. Ct. 2668, 2679 (1990) (agency expertise [is] principal justification for deference); Kelley, 17 F.3d at 842; Colorado Pub. Utili[ties] Comm'n v. Harmon, 951 F.2d 1571, 1578-79 (10th Cir. 1991); West, 879 F.2d at 1136-3[7] (Mansmann, J., concurring and dissenting); Capitano, 732 F.2d at 1076; Mathews, 590 [F.2d] at 1259.

First of all, it is apparent that the agency did not thoroughly consider [the] issue of reporting and certification requirements. In the two letters to state Med[icaid] directors, the agency provides no explanation at all why states must have a waiver provision. Other than the explanation it offers in its amicus brief (which we requ[ested]

45

the agency offers no justification for its rule. This is similar to the situation court faced in Mathews, 590 F.2d at 1258, where the court rejected the agency's interpretation.

Even in her brief, the Secretary states only that lack of a waiver provis could become an "insuperable barrier" to victims of rape and incest seeking Medicai funded abortions, relying entirely on the fact that rape is a "vastly underreported crime. This is both speculative and shallow reasoning, and, in any event, is nothi than a litigating position entitled to no weight. See Martin, 499 U.S. at ____, 11 Ct. at 1179; Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 212, 109 S. Ct. 468, 47 (1988). Fundamentally, I remain unconvinced that the Secretary has really taken th necessary "hard look" at this question. See Greater Boston Television Corp. v. Fed Communications Comm'n, 444 F.2d 841, 851-52 (D.C. Cir. 1970) ("hard look" necessary satisfy reviewing court that agency action not based on "impermissible whim, improp influence or misplaced zeal"), cert. denied, 403 U.S. 923, 91 S. Ct. 2233 (1971).

Second, although the agency's position is temporally fairly close to the enactment of the 1994 Hyde Amendment, it is not one of long-standing. This factor, accordingly, does not favor according any deferential weight to the agency's interpretation. See Davis, 495 U.S. at 484, 110 S. Ct. at 2022; Kelley, 17 F.3d at (refusing to give weight to contemporaneous interpretation not in long use); see al Peña, 44 F.3d at 445 (Easterbrook, J., concurring) (long-standing interpretations e to more weight only because they shed light on the meaning of the statute when enac Richard A. Posner, The Federal Courts: Crisis and Reform 279-80 (1985) (view of cur administration, in the absence of long-standing, consistent interpretation, not ent to weight).

Finally, I turn to the issue of agency expertise. If this case involved the issues we typically review under the Medicaid Act, I would be the first to say the Secretary has developed a tremendous amount of it. That is not the case here,

46

however.  Under the Hyde Amendment, funding for abortion, even in cases of rape and

incest, was forbidden from 1982 through 1993.  Quite simply, abortion of pregnancie

caused by rape and incest is not something the agency has had to deal with within r

institutional memory.  And it certainly is no expert on the criminology of rape and

reporting.  It therefore lacks any comparative advantage vis-a-vis this court with

to the issue at hand.  I would therefore not accord the agency's interpretation

controlling weight. See Hi-Craft Clothing, 660 F.2d at 915; Mathews, 590 F.2d at 12

Director, OWCP v. Mangifest, 826 F.2d 1318, 1333-34 (3d Cir. 1987) (Weis, J., concu

C.

My conclusion is philosophically annealed by the fact that the agency's l

do not merely regulate a private party: they attempt to preempt a state statute.  C

the reasons for Chevron deference is that "federal judges--who have no constituency

a duty to respect legitimate policy choices made by those who do." Chevron, 467 U.

866, 104 S. Ct. at 2793.  The argument is that agencies, which at least in theory a

indirectly responsive to majoritarian pressure, are more legitimate policy makers t

Article III courts.  With respect to regulation of private party conduct, that theo

holds reasonably true; agencies are at least the delegates of the Congress and are

the subordinates of the Executive.  It is no secret, however, that what is true in

may be less so in practice; because of superior expertise and "agency capture," act

agency action may be less majoritarian than we might hope. See Sanford N. Caust-

Ellenbogen, Blank Checks: Restoring the Balance of Powers in the Post-Chevron Era,

L. Rev. 757, 814 (1991).  Even so, it is reasonable in such circumstances to favor

policy choices of agency heads rather than judges.

That situation shifts considerably, however, in the context of preemptior

There, the two alternative policymakers are: (1) unelected and only theoretically

accountable bureaucrats on one side of the balance; and (2) the elected state legis

on the other.  That is our case, and I think the balance tips sharply in favor of

upholding state law; not a federal agency's interpretation.  Under the Supremacy Cl

federal agency only has the power to preempt when it clearly, conscientiously and 

exercises its delegated authority under § 553 of the APA, not when it issues an

interpretive rule.  Cf. Puerto Rico Dep't of Consumer Affairs v. Isla Petroleum Cor

U.S. 495, 503, 108 S. Ct. 1350, 1355 (1988) ("a clear and manifest [federal] purpos

always required" for preemption); Ray v. Atlantic Richfield Co., 435 U.S. 151, 157,

Ct. 988, 994 (1978) (same).

Indeed, under the law of this circuit, an interpretive rule cannot preemp

law.  See United States v. Walter Dunlap & Sons, Inc., 800 F.2d 1232, 1239 (3d Cir.

("Because the regulations on which FmHA relies do not have the force of a congressi

directive and because there is no indication that Congress intended an agency regul

to supersede long-standing uniform state law in this area, we decline to accept the

government's position that the regulations control.").  This makes good logical sen

because it takes law to displace law, and an interpretive rule simply lacks the for

law.  Other courts and commentators appear to be in accord.  See

Koch & Wright, supra, § 3.59, at 73-74 (Supp. 1995) (citing South Central Bell Tel.

Louisiana Pub. Serv. Comm'n, 744 F.2d 1107 (5th Cir. 1984), vacated on other ground

U.S. 1166, 106 S. Ct. 2884 (1986); New England Tel. & Tel. Co. v. Public Utilities

742 F.2d 1, 11 (1st Cir. 1984), cert. denied, 476 U.S. 1174, 106 S. Ct. 2902 (1986)

IV.

That brings me finally to Pennsylvania's second physician certification

requirement.  Unlike the agency's two letters explaining its interpretation of repo

and certification requirements, here the Secretary promulgated a valid legislative 

with the force of law.  See 42 C.F.R. §441.203 (speaking in terms of "a physician")

interpretation, therefore, would appear to flow directly from the text of her regul

merely reminding states of an existing duty.

48

I do not believe, however, that Congress ever delegated any authority for

Secretary to make such a rule.  I recognize that the Secretary has "exceptionally b

authority" to interpret the Medicaid Act itself, Schweiker v. Gray Panthers, 453 U.

43, 101 S. Ct. 2633, 2640 (1981); see majority typescript at 26, but the Medicaid A

not at issue here.  The statutory text under interpretation is the Hyde Amendment t

appropriations bill that funds the Medicaid program, and there is not one scintilla

evidence in the Hyde Amendment that Congress intended the Secretary to interpret ei

the scope and extent of her appropriation or the validity of state-imposed second

physician certification requirements.  Unlike most substantive statutes administere

regulatory agencies, the Hyde Amendment contains no provision enabling the Secretar

make regulations with the force of law.  At best, it is silent on the issue.  The m

fact of legislative silence, however, does not necessarily imply the existence of a

deliberate "gap" in the statute, much less a gap that we must infer Congress intend

Secretary to fill through administrative regulation.[0]  Because there was no delegat

the regulation upon which the majority relies is properly treated only as an interp

rule.  See EEOC, 499 U.S. at ____, 111 S. Ct. at 1235; Gilbert, 429 U.S. at 141-42,

Ct. at 410-11; Batterton, 648 F.2d at 705.

Applying a Skidmore analysis to 42 C.F.R. § 441.203, it would probably, u

normal circumstances, be entitled to controlling weight.  The regulation, after all

enacted soon after the first Hyde Amendment was passed in 1977, and has not changed

[0]See, e.g., Railway Labor Executives' Ass'n v. National Mediation Bd., 29 F.3d 655,
(D.C. Cir. 1994) (en banc) (presuming a delegation would enable agencies to "enjoy
virtually limitless hegemony"); West, 879 F.2d at 1138 (Mansmann, J., concurring an
dissenting) (mere silence or ambiguity does not automatically imply delegation to t
agency); Weis, supra, at 305 ("If Congress has not clearly delegated a properly
circumscribed power, then the agency should not obtain untrammeled discretion throu
legislative silence."); Herz, supra at 204 ("Courts should not equate a mere lack o
clarity with a delegation of decision-making authority to the agency."); Cass R. Su
Interpreting Statutes in the Regulatory State, 103 Harv. L. Rev. 405, 445 (1989) ("
ambiguity is simply not a delegation of law-interpreting power."); Cass R. Sunstein
Constitutionalism After the New Deal, 101 Harv. L. Rev. 421, 467 (1987) (same).

49

Moreover, because the Hyde Amendment has always permitted funding for Medicaid abo[rtion] where the life of the mother would otherwise be endangered, the agency does have considerable expertise in this area.  Ordinarily, then, I would agree with the majo[rity] that the Secretary's interpretation is controlling.

As I have already discussed in Part III(C), however, this is a preemptio[n case] and an interpretive rule cannot preempt state law.  <u>Dunlap</u>, 800 F.2d at 1239. Accordingly, I would uphold Pennsylvania's second physician certification requireme[nt].

## V.

Because the majority incorrectly defers under <u>Chevron</u> to the Secretary's interpretations, and because there is no basis for its holding in the Hyde Amendmen[t] itself, I dissent.